112 F.3d 262
 Lisa FORBES, Plaintiff-Appellant,
v.
Jim EDGAR, Howard A. Peters III, Harry Shuman, Gwendolyn V.
Thornton, Steven J. Punis, Donna Klein-Acosta,
Patricia A. Dunbar, and Monica A.
Becker, all individually,
Defendants-Appellees.
 No. 95-3134.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 14, 1997.
Decided April 18, 1997.
Rehearing and Suggestion for Rehearing
En Banc Denied June 4, 1997.
 
 James Chapman, Chicago, IL (argued), for Plaintiff-Appellant.
 Rita Novak, Laura Wonder (argued), Office of the Attorney General, Chicago, IL, for Defendants-Appellees.
 Before RIPPLE, MeMANION, and EVANS, Circuit Judges.
 TERENCE T. EVANS, Circuit Judge.
 
 
 1
 When Lisa Forbes entered the Dwight Correctional Center as a prisoner in 1987 her Mantoux skin test for tuberculosis was negative. Tests for several years thereafter were also negative. A test administered in August 1992, however, was positive. Drawing an obvious conclusion, Forbes contends that she came in contact with the tubercle bacilli at Dwight. Her next conclusion is a bigger leap: she contends in this lawsuit that prison officials and others--in allowing her to be exposed--were deliberately indifferent to her serious medical needs, in violation of the Eight Amendment to the United States Constitution. Her rights were also violated, she claims, by the medical treatment she received after the positive test turned up.
 
 
 2
 In the district court, along with her complaint, Forbes filed a request for leave to proceed in forma pauperis and a request for the appointment of counsel. After being required to make a partial payment of the filing fee she was allowed to proceed but, relying on Merritt v. Faulkner, 697 F.2d 761 (7th Cir.1983), cert. denied, 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366, Judge Joe Billy McDade denied her motion for the appointment of counsel. The defendants filed a motion to dismiss the complaint, contending that Forbes had not stated an Eighth Amendment claim based on deliberate indifference and furthermore that she failed to allege that some of the defendants had a personal involvement in the specifics about which she complained. Judge McDade converted the motion to one for summary judgment and denied it on the basis that the record required further factual development. He said that in order to decide the motion he needed certain medical information and a full statement of Dwight's procedures for dealing with TB.
 
 
 3
 Forbes then renewed her motion for the appointment of counsel, saying she was in no position to do the "medical investigation" she deemed necessary for her case. The motion was again denied. The defendants filed a second motion for summary judgment, and this time they hit pay dirt. After the suit was dismissed, Forbes appealed, claiming that both the decision granting summary judgment and the one denying her motion for the appointment of counsel were wrong. On the issue of representation, Forbes contends that Judge McDade acknowledged that hers was a complex case, but nevertheless refused to appoint counsel to represent her.
 
 
 4
 Although an indigent civil litigant in federal court has no right to the appointment of counsel, a court can request that an attorney handle the case, and thus in effect "appoint" that attorney to the case. 28 U.S.C. § 1915(d). We reverse a district court's refusal to make an appointment of this sort only for an abuse of discretion if, given the difficulty of the case and the litigant's ability, she could not obtain justice without an attorney, she could not obtain a lawyer on her own, and she would have had a reasonable chance of winning with a lawyer at her side. Farmer v. Haas, 990 F.2d 319 (7th Cir.1993), cert. denied, 510 U.S. 963, 114 S.Ct. 438, 126 L.Ed.2d 372; Dellenbach v. Hanks, 76 F.3d 820 (7th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 237, 136 L.Ed.2d 167. On appeal, Forbes has an attorney, who, by the way, has indicated a willingness to litigate this case should it be remanded to the district court.
 
 
 5
 But the issue before us is not whether there is an attorney who is now willing to litigate the case or whether we wish one had been appointed in the district court. The issue is whether, given the standards we have noted in other cases, Judge McDade abused his discretion when he decided not to appoint an attorney to represent Ms. Forbes. Looking to those standards, we note for one that Forbes is an exceptionally able litigant. The documents she submitted to the district court are comprehensible and literate. She also has experience litigating other cases--at least four of them, and in one she filed a response to a summary judgment motion shortly before this case got going--in the Central District of Illinois. She says, however, that this particular case is very important to both the prison population and the rest of the citizens of this country, that it is complex, and, presumably, that with a lawyer the result will be different.
 
 
 6
 We do not argue with the proposition that tuberculosis can be a serious problem in prisons. If allowed to spread it can result in highly undesirable situations. See DeGidio v. Pung, 704 F.Supp. 922 (D.Minn.1989), aff'd, 920 F.2d 525 (8th Cir.1990). Whether the situation at Dwight was a problem, however, is something we'll get to soon in regard to the summary judgment motion.
 
 
 7
 As to the complexity of the issues, we note that while this case involves an issue of medical treatment, it does not involve technical facts. Also, we think Ms. Forbes exaggerates a bit when she says "Judge McDade said he found the issues too complex for him to understand without the aid of expert testimony." There is no citation to the record for this proposition. We assume it is her reading of the November 23, 1994, decision denying the defendants' first motion for summary judgment. Our reading of that decision is that Judge McDade found himself confronted with an inadequate record. He said, "Because the record requires further factual development, the motion will be denied." He makes a number of similar statements:
 
 
 8
 The record is insufficiently developed for ruling on either of the plaintiff's basic claims.....
 
 
 9
 The defendants, on the other hand, have provided no medical authority to refute the plaintiff's claims.
 
 
 10
 ....
 
 
 11
 In order to resolve the plaintiff's claim, the court will require information regarding the above matters, as well as discussing Dwight's procedures for screening, treating and isolating inmates with TB.
 
 
 12
 ....
 
 
 13
 The facts [regarding medical treatment] are muddled and, again, the court is not knowledgeable as to the proper treatment for tuberculosis or TB exposure.
 
 
 14
 ....
 
 
 15
 In short, the record is not sufficiently developed for resolution of this action. In order to determine the merits of the plaintiff's claims, the court will require a coherent statement of undisputed facts and an application of those facts to the pertinent case law. Any factual medical assertions must be supported by medical records and/or competent authority.
 
 
 16
 Judge McDade wanted more information, but he did not seem overly concerned that he would not be able to cope with the facts once they were presented to him. In fact, some of those facts would be quite straightforward; for instance, what was Dwight's policy regarding infected individuals? We are not convinced that any of the issues in this case are unusually complex.
 
 
 17
 Most importantly, we are not convinced that the result would have been, nor could have been, different had Forbes had an attorney. Which brings us to a discussion of the summary judgment motion.
 
 
 18
 Although she has set out her grievances in several separate claims, basically Forbes sees two ways in which the defendants were deliberately indifferent to her serious medical needs: one was in allowing TB to be spread in the prison, and the other was in the type of drug therapy she was offered. Raised as they were on summary judgment, we consider the issues de novo, construing the evidence in the light most favorable to Ms. Forbes. Flaherty v. Gas Research Institute, 31 F.3d 451 (7th Cir.1994).
 
 
 19
 As a screening device for detecting tuberculosis among inmates, medical officials at Dwight use the Mantoux skin test. The test is designed to detect the existence of the tubercle bacilli in the body. If the tubercle bacilli is present, however, that is not the end of the matter. TB can be active or dormant. A person with dormant TB is not infectious and has no symptoms of the disease. Therefore, if a person's skin test is positive, subsequent steps are taken at Dwight to evaluate the extent of the infection. The inmate is checked for symptoms, such as coughing, cold sweats, or fever, and a chest X ray is taken. If the chest X ray is interpreted as normal and the inmate has no symptoms, then a two-drug prophylactic therapy is prescribed. It consists of the administration of Isoniazid (INH) and vitamin B6 twice weekly for six months. Most people at this stage do not ever, treated or untreated, contract full-blown TB.
 
 
 20
 If the inmate is diagnosed as having active TB she is placed in respiratory isolation and receives a four-drug therapy. With either drug therapy the inmates are required to take their medicine under a nurse's direct observation. According to the Center for Disease Control, persons with active TB do not remain infectious after treatment takes effect. Rather, they require respiratory isolation only until they are on therapy and have three consecutive daily negative sputum smears.
 
 
 21
 For the most part, Forbes' experience was consistent with these procedures. Her Mantoux skin test showed the presence of tubercle bacilli, and she was then given a chest X ray. The X ray showed no abnormalities and the two-drug therapy was prescribed. Her complaint about this treatment is that she thinks the drugs should be taken every day. At Dwight, because of the perceived burden on the nursing staff, the drugs are administered twice a week, with, in effect, a three-day dose on one day and another three-day dose on the other. Forbes feared that on this schedule a resistance to the drugs would develop so she refused to take the medication. And prior to the filing of her complaint she wrote a number of letters to prison authorities and others up to and including the governor of Illinois, stating her belief that her treatment was not appropriate.
 
 
 22
 Forbes says that when she asked the medical staff how she could have been exposed to TB, both Monica Becker, Dwight's medical unit administrator, and Patricia Dunbar, Dwight's medical director and staff physician, told her there were no active cases of TB at Dwight and that she might have picked up the tubercle bacilli in the visiting room. Forbes does not believe this explanation. She thinks she was exposed to one of two inmates with tuberculosis who were not properly quarantined. She says that one woman had active TB, but that her medical records have been altered to mask that fact, and that there were rumors that another inmate also had active tuberculosis. To bolster her claim, Forbes also says that program staff meeting minutes from February 13, 1992,[1] show that Dwight had its first case of TB and that the staff was instructed to wear face masks and take other precautions while in the presence of the infected inmate. Even if hers is an accurate view of the minutes, they do not show that any infected person was not in respiratory isolation during the infectious stage of an illness. For purposes of our analysis, we will assume that there was an inmate or two with active tuberculosis at Dwight. There is no evidence, however, that if such inmates existed, they were deliberately left in the general population while they were infectious, in violation of the prison's written procedures.
 
 
 23
 It has long been established that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Exactly what that means has not always been clear. Generally, prison officials violate the amendment only when two requirements are met. One is that the deprivation must be sufficiently serious. Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Inadequate treatment of a serious nature can qualify, see Hughes v. Joliet Correctional Center, 931 F.2d 425 (7th Cir.1991), as can the "exposure of inmates to a serious, communicable disease," Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Secondly, the defendants must exhibit something courts call "deliberate indifference." Recently the Supreme Court has explicated the phrase and concluded that "subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 839-40, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994). In short, the Court concluded that
 
 
 24
 a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.
 
 
 25
 Farmer at 847, 114 S.Ct. at 1984.
 
 
 26
 One thing which has long been clear in our Eighth Amendment cases is that the amendment is not coterminous with a medical malpractice claim. See Bryant v. Madigan, 84 F.3d 246 (7th Cir.1996); Oliver v. Deen, 77 F.3d 156 (7th Cir.1996); Snipes v. DeTella, 95 F.3d 586 (7th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 980, 136 L.Ed.2d 863. Ordinary malpractice does not rise to the level of an Eighth Amendment claim. Vance v. Peters, 97 F.3d 987 (7th Cir.1996). As we said in Snipes, "the Constitution is not a medical code that mandates specific medical treatment." At 592.
 
 
 27
 Forbes' primary problem in this case is that the conduct of the officials does not reveal anything approaching "deliberate indifference." Forbes is seeking a specific treatment and foolproof protection from infection. The Eight Amendment does not provide her with either. And no amount of lawyering could overcome the gap between her claims and the requirements for a successful Eighth Amendment claim.
 
 
 28
 As to the facts on the alleged failure to properly isolate inmates with active TB, what is clear is that even Forbes does not claim that officials at Dwight knowingly ignored the need to control tuberculosis. The missing February 13, 1992, minutes indicate, at the worst, that Dwight is facing its first case of active TB. Forbes says that two inmates had active TB. This is a far cry from the situation in the DeGidio case on which she places so much reliance. In DeGidio, between 1982 and 1989, at the Stillwater prison in Minnesota, there were nearly a dozen inmates diagnosed with active tuberculosis, and over one-third of the inmate population (which was 1200) had been infected. There was a finding that the prison failed to diagnose tuberculosis because it failed to perform adequate testing. Prison-wide testing was not begun until 1986. After infection was diagnosed, sometimes long after it should have been, the INH therapy was not administered under direct medical supervision. It appears that no one accepted responsibility for overall medical care at the prison, and from 1981 until 1985 there was only one physician working at the prison and he only worked there half-time.
 
 
 29
 In contrast, at Dwight tuberculosis control procedures were in effect, and Forbes' own experience indicates that they were followed. The procedures are consistent with those recommended by the Center for Disease Control and the American Thoracic Society. The procedures belie any attempt to show that the defendants were deliberately indifferent to a risk of injury or infection. That infection may occur and even that isolated mistakes might be made despite the procedures and reasonable care does not make the defendants liable under the Eighth Amendment. Duane v. Lane, 959 F.2d 673 (7th Cir.1992).
 
 
 30
 Forbes also complains that the preventive therapy she was offered was not the preferred therapy. According to the documents in the record from the Center for Disease Control, ideally the administration of INH and Vitamin B6 would be daily and should be continued for at least six months. However, the twice-weekly approach is also approved:
 
 
 31
 Each dose of preventive therapy should be administered by a designated ancillary medical staff person who watches the patient swallow the pills. Since daily supervised therapy is often not feasible, twice-weekly supervised therapy is a satisfactory alternative.
 
 
 32
 Most experts believe twice-weekly intermittent preventive therapy (using isoniazid [INH] 900 mg) is effective, although it has not been studied in controlled clinical trials. Medication should not be given to an inmate without direct observation of drug ingestion.
 
 
 33
 Center for Disease Control Morbidity and Mortality Weekly Report, Vol. 38, No. 18, May 12, 1989.
 
 
 34
 Under the Eighth Amendment, Forbes is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her. The defendants have taken those measures.
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 The minutes are not in the record. However, because Forbes contends that they would be if only she had a lawyer who would have known how to obtain them, we will not refuse to consider her version of the contents of the minutes