Larry WINSETT, Petitioner–Appellant,

v.

**Odie WASHINGTON, Warden of Dixon Correctional Center, Respondent–Appellee.**

No. 94–2891.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1997.

Decided Nov. 18, 1997.

---

Allen E. Shoenberger (argued), Loyota University School of Law, Chicago, IL, for Petitioner–Appellant.

Lorna Trinidad DeLeon Amado (argued), Office of the Attorney General, Chicago, IL, Martha E. Gillis, Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondent–Appellee.

Before CUMMINGS, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Police officers questioned Larry Winsett in violation of his *Miranda* rights about his role in a murder-for-hire scheme. In this interrogation, Winsett divulged the name of his accomplice, and the State eventually secured the cooperation of this accomplice in the

prosecution of Winsett. Winsett argued in state post-conviction proceedings that the accomplice's testimony should have been inadmissible as the "fruit of a poisonous tree" and that his lawyer should have raised this issue on direct appeal. The Illinois Supreme Court rejected these contentions, and Winsett now appeals the district court's denial of these same claims in his petition for a writ of habeas corpus. We affirm.

## I. BACKGROUND

David Robinson had an affair with Maria Zarinara, the wife of Arturo Zarinara, in the summer of 1984. Mrs. Zarinara testified at Petitioner's trial that Robinson became obsessed with her. Robinson let two employees at his construction company know in October 1984 that he was interested in paying someone to kill Mr. Zarinara. One of these employees introduced Robinson to the petitioner, who claimed to know someone who would perform the murder. After some haggling over price, Robinson gave Winsett $20,000 to arrange the murder of Mr. Zarinara; they agreed to refer to the job as a "car sale" in any subsequent conversations. Winsett then subcontracted the hit to Glenn Spruille for $2,000, but Spruille (luckily) could not complete the job despite shooting Zarinara four times on January 9, 1985. Robinson received a phone message that night from a man named "Larry" stating that Robinson's car had been sold.

Four plainclothes police officers [1] arrested Winsett at his home on February 20, 1985, as he was eating dinner with his family. When the officers placed him under arrest, Winsett immediately told one of the detectives, "I want a lawyer." In addition, Winsett told his wife to call his lawyer numerous times during the course of the arrest in front of his six children, sister-in-law, brother-in-law, and nephew. The trial court found these family members' testimony to be "extremely credible." The officers told Mrs. Winsett that they were taking her husband to the Lake County Sheriff's Office and that he would be able to phone her after he was booked.[2]

They instead took Winsett to an interview room in the Waukegan Police Station. Winsett received his *Miranda* warnings and was asked to sign a waiver form prepared by one of the officers; he refused to sign the waiver and expressed his unwillingness to make any statements until he could speak with his attorney. Undeterred, the officers kept questioning Winsett for nearly two-and-a-half hours. Petitioner asked to speak to his lawyer at least three separate times during this interrogation, but the officers persisted in their interrogation.

Winsett eventually identified Glenn Spruille as his accomplice in the attempted murder of Mr. Zarinara. After making this statement, the police presented Winsett with another *Miranda* waiver form, which this time he signed. Finally, the officers allowed him to call his wife; telephone records show that he made this call nearly three-and-a-half hours after his arrest at home. Mrs. Winsett relayed the petitioner's location to his lawyer, who arrived at the police station soon thereafter and belatedly advised the petitioner not to sign any statements. Based on Winsett's confession, the police tracked down Spruille, who cooperated in the prosecution of Winsett in exchange for the prosecutor's recommendation of a reduced sentence.

Soon after his indictment, Winsett filed a motion to suppress the statements he made to the police. In the course of this hearing, the circuit court heard evidence from a number of witnesses, including Winsett, his family members, and the police officers, regarding the circumstances of the petitioner's interrogation and statements. Winsett testified that he was "scared and confused" during the interrogation and that the police officers "manipulated [him] into a state of duress and confusion." The court granted the petitioner's motion to suppress the statements because they were made after

---

**1.** Two were detectives from the Waukegan Police Department and two were police officers from the Round Lake Beach Police Department.

**2.** The officers did not, however, take Winsett to the Lake County Sheriff's Office. In response to

Mrs. Winsett's repeated calls, Lake County sheriffs told her for over an hour that there was no record of his presence in their custody. No one, apparently, knew where the police officers had taken Winsett.

his repeated requests for counsel in violation of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). However, the court found that the petitioner's statements were not involuntary in violation of the Fifth Amendment and could therefore be used for impeachment purposes at trial:

> I find there was no trickery, there was no coercion, that there was nothing ... other than the violation of the affirmative request for counsel ... I do not find it was voluntary from-involuntary from the point of view of coercion, so as to suspect authenticity to make it inadmissible under *Harris v. New York.*

The court denied a subsequent motion *in limine* in which Winsett claimed that his statements to the police and all evidence resulting from those statements should be excluded as "fruits" of his tainted interrogation; the court stated in its ruling that the "present state of the law was such that the motion was not well taken."

A jury convicted Winsett of attempted murder, solicitation to commit murder, and conspiracy to commit murder. In a post-trial motion, Winsett asked for a new trial based on the admission of Glenn Spruille's testimony, which Winsett characterized as the fruit of an unconstitutional interrogation. The trial court denied this motion and sentenced Winsett to concurrent terms of forty years in prison for the attempted murder and solicitation of murder charges, as well as a fourteen-year prison term for the conspiracy conviction. Defense counsel pressed only two points on direct appeal: (1) the jury did not hear sufficient evidence of the petitioner's guilt beyond a reasonable doubt, and (2) the trial court should not have admitted testimony concerning the cryptic phone message from "Larry" to Robinson on the night of the attempted murder. The Illinois Appellate Court affirmed Winsett's conviction and sentence in an unpublished order on October 2, 1986, and the Illinois Supreme Court denied his petition for leave to appeal on February 6, 1987.

In state post-conviction proceedings, Winsett claimed both that the admission of Spruille's testimony was error and that his appellate counsel was unconstitutionally ineffective in failing to raise this issue on direct appeal. The trial court rejected Winsett's post-conviction petition, but the state appellate court reversed and found merit in his claims. 222 Ill.App.3d 58, 164 Ill.Dec. 673, 583 N.E.2d 589 (1991). The Illinois Supreme Court, though, reversed the appellate court and upheld the trial court's decision, 153 Ill.2d 335, 180 Ill.Dec. 109, 606 N.E.2d 1186 (1992), and the United States Supreme Court then denied his petition for a writ of certiorari, 510 U.S. 831, 114 S.Ct. 102, 126 L.Ed.2d 68 (1993). The district court subsequently denied Winsett's petition for a writ of habeas corpus. *United States ex rel. Winsett v. Washington,* 860 F.Supp. 479 (N.D.Ill.1994).

## II. DISCUSSION

Winsett makes four claims of error in his appeal of the district court's decision. As before, he argues that the trial court should have excluded the testimony of Glenn Spruille as the fruit of an unconstitutional interrogation. He also claims again that his appellate counsel provided ineffective assistance by not raising this point on appeal. In addition, he now adds for the first time a claim that his trial counsel provided inadequate representation by failing to challenge the voluntariness of his statements. Finally, Winsett argues that the district court should not have adjudicated his petition before ruling on his pending motion requesting the appointment of counsel.

We are unable to reach the merits of Winsett's first claim because granting the relief he requests would state a new rule of law in contravention of the rule of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). We reject his ineffective assistance of appellate counsel claim based on his inability to show the requisite prejudice; he waived his other ineffective assistance claim by failing to present it to the district court. Finally, his allegation of a due process violation based on the district court's failure to rule on his motion for appointment of counsel is meritless. We therefore affirm the district court's denial of Winsett's petition.

## A. Fruit of the Poisonous Tree

Winsett contends that police officers unconstitutionally extracted information from him regarding Glenn Spruille. He argues that the officers violated his Fifth Amendment privilege against self-incrimination by coercing him into making inculpatory statements. Petitioner asserts that the trial court should have granted his motion *in limine* to exclude all evidence derived from these statements as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 485–86, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963). Under this exclusionary rule, a "poisonous tree" is a violation of one of a defendant's constitutional rights. *See, e.g., Harrison v. United States*, 392 U.S. 219, 222–23, 88 S.Ct. 2008, 2010–11, 20 L.Ed.2d 1047 (1968) (applying the fruit of the poisonous tree doctrine to a Fifth Amendment violation). Winsett believes that the poisonous tree in this case is the officers' violation of his *Miranda* rights and/or their coerced extraction of an involuntary statement; these lines seem to blur for the petitioner, though, when he argues that the statements are involuntary under the Fifth and Fourteenth Amendments *because* they were taken in violation of *Miranda*. We address each contention in turn to determine whether the trial court should have found that the police officers violated Winsett's Fifth and Fourteenth Amendment rights and, if so, whether Glenn Spruille's testimony should have been excluded as a fruit of that poisonous tree.

### 1. Voluntariness of Winsett's Statements

■ The trial court in this case found that the police officers violated Winsett's *Miranda* rights and that the prosecution could not use the statements in its case-in-chief. The court also ruled, though, that the statements were not involuntary and that they could be used for impeachment purposes. Winsett did not contest this finding of voluntariness at trial and did not raise the issue on direct appeal. In post-conviction proceedings, Winsett argued that the evidence pertaining to Glenn Spruille should have been excluded because the officers obtained this evidence by violating his *Miranda* protections. He did not, however, challenge the

voluntariness of his statements in these post-conviction proceedings or in his petition to the district court for a writ of habeas corpus. Normally, a party waives those issues it fails to raise in the district court. *See, e.g., Henderson v. DeTella*, 97 F.3d 942, 946 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1471, 137 L.Ed.2d 683 (1997). As in the context of the exhaustion of state-court remedies, it is not enough here that the petitioner pleaded some of the same basic facts and made a somewhat similar claim. *See Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982). We must decide, therefore, whether Winsett presented his voluntariness challenge to the district court.

■ Winsett typed a four-page description of the grounds on which he sought a writ of habeas corpus. For the most part, the petition details the numerous state court rulings in his case. Its only reference to the voluntariness of his statements is a recapitulation of the trial court's ruling on the question. Petition for Writ of Habeas Corpus, No. 94 C 821, at 6 ("[T]he trial judge stated that there was no showing that the police used any trickery so as to render the confession involuntary, and that the confession would be admissible to impeach Petitioner if he were to testify."). Nowhere in the petition does Winsett plead any facts—much less any legal arguments-that would support a claim of involuntariness. He complains about his interrogation by police officers only in terms of the violation of his *Miranda* rights; when describing this violation, he never provides specific factual examples of police conduct that might have also rendered his statements involuntary, but rather speaks only in conclusory terms regarding the *Miranda* violation. There was nothing in Winsett's petition from which the district court could have inferred an involuntariness challenge, and we find it telling that he has never objected to the district court's failure to consider the issue.

Winsett cannot expect the district court to presume a voluntariness challenge simply because he demonstrated a violation of his *Miranda* rights. It may be true that the same facts can sometimes trigger both a Fifth Amendment prohibition on the use of invol-

untary statements and the *Miranda* exclusionary rule. As the bulk of this opinion explains, however, the two protections are constitutionally distinct, and Winsett does not plead one automatically by pleading the other. Winsett tacitly concedes this point when he alleges that his trial counsel was incompetent for arguing the *Miranda* point without objecting also to the trial court's voluntariness determination. Thus, we cannot consider Winsett's voluntariness challenge because he did not present it to the district court.

### 2. Statements Obtained in Violation of Miranda

■ The trial court suppressed the statements made by Winsett because police officers obtained them in violation of his *Miranda* rights. Winsett argued that this *Miranda* violation, standing alone, was a sufficient constitutional violation to justify exclusion of all derivative evidence as the fruit of a poisonous tree. The Supreme Court, however, established *Miranda* protections as prophylactic safeguards of the Fifth Amendment and has not recognized those safeguards as independent constitutional rights. *See infra* at 275–77. Winsett's habeas petition, then, hinges on our willingness to create a new rule of constitutional law that gives *Miranda* greater constitutional status than that bestowed by the Supreme Court.

We are forbidden from taking such a step by the Court's prohibition against applying "new constitutional rules of criminal procedure" on collateral review. *Teague v. Lane,* 489 U.S. 288, 316, 109 S.Ct. 1060, 1078, 103 L.Ed.2d 334, (1989). *Teague* allows us to grant Winsett's petition for a writ of habeas corpus only if the dispositive rule of law was "dictated by precedent existing at the time the petitioner's conviction became final," *Cas-*

*pari v. Bohlen,* 510 U.S. 383, 390, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994) (quoting *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070), or, put another way, if "a state court considering [his] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." *Gray v. Netherland,* —— U.S. ——, ——, 116 S.Ct. 2074, 2083, 135 L.Ed.2d 457 (1996) (quoting *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990)).

■ Neither party addressed the application of *Teague* to this case, but the Supreme Court has noted that a court may raise the issue of its own volition. *See Goeke v. Branch,* 514 U.S. 115, 116–18, 115 S.Ct. 1275, 1276, 131 L.Ed.2d 152 (1995) (noting that Teague is not jurisdictional and that "a court need not entertain the defense if the state has not raised it"); *Caspari,* 510 U.S. at 389, 114 S.Ct. at 953 ("[A] federal court may, but need not, decline to apply *Teague* if the State does not argue it."); *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 2718–19, 111 L.Ed.2d 30 (1990) (stating that the *Teague* rule is not jurisdictional but that courts may raise it where applicable). Several decisions of this Court emphasize the discretionary nature of our decision to raise the *Teague* rule when the Government waives it. *See Spreitzer v. Peters,* 114 F.3d 1435, 1442 n. 1 (7th Cir.1997); *Young v. United States,* 124 F.3d 794, 797 (7th Cir.1997); *Jones v. Page,* 76 F.3d 831, 850 (7th Cir.1996); *Eaglin v. Welborn,* 57 F.3d 496, 499 (7th Cir.1995) (en banc); *Stewart v. Lane,* 60 F.3d 296, 299 (7th Cir.1995). We exercise our discretion to consider the application of *Teague* to Winsett's petition before addressing the merits of his constitutional challenge.[3]

In determining whether *Teague* bars consideration of this claim of Winsett's habeas

---

**3.** One member of this Court has written that "[o]ur jurisprudence has yet to develop guiding principles as to when our court ought to raise *Teague* despite the failure of the state to do so." *Stewart,* 60 F.3d at 304 (Ripple, J., concurring). We are wary of prescribing a multi-factor test to direct this discretionary decision. We note only generally that courts should be vigilant in their respect of comity and finality principles; the policies underlying *Teague's* prohibition on an-

nouncing new constitutional rules on collateral review do not apply any less forcefully simply because the State waived the argument. At the same time, courts are not precluded from taking the opportunity provided by a *Teague* waiver to remedy wrongful convictions or sentences. *See Granberry v. Greer,* 481 U.S. 129, 135, 107 S.Ct. 1671, 1675–76, 95 L.Ed.2d 119 (1987) (applying a similar suggestion to courts facing waivers of a non-exhaustion argument in habeas cases).

petition, we follow the Supreme Court's instruction to proceed in three steps. *See Caspari*, 510 U.S. at 390, 114 S.Ct. at 953. First, we must ascertain the date on which Winsett's conviction and sentence became final. In the second step, we must determine whether the Illinois courts denied Winsett's fruit of the poisonous tree claim based on "reasonable, good-faith interpretations" of precedent existing at that time. *Butler v. McKellar*, 494 U.S. 407, 414, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990). Finally, if the second step establishes that Winsett seeks the benefit of a new rule, we must decide whether this new rule fits within either of two narrow exceptions to the nonretroactivity principle.

■ The first inquiry is very straightforward. Winsett pressed his direct appeal to the Illinois Appellate Court, which affirmed his conviction and sentence in an unpublished order on October 2, 1986. *People v. Winsett*, 147 Ill.App.3d 1161, 111 Ill.Dec. 234, 512 N.E.2d 138 (1986) (table). The Supreme Court of Illinois denied his petition for leave to appeal on February 6, 1987, and his opportunity to seek review by the United States Supreme Court expired ninety days later when he failed to file a petition for a writ of certiorari. *See* Sup.Ct. R. 13. His conviction and sentence, therefore, became final on May 7, 1987. *See Caspari*, 510 U.S. at 390, 114 S.Ct. at 953 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely petition has been finally denied.").

Under the second step, the question now becomes whether the Illinois courts in 1987 reasonably could have denied Winsett the relief he seeks in his federal petition. Winsett claims that the police officers' violation of his *Miranda* rights is a constitutional violation sufficient to support the exclusion of all evidence derived from his tainted statements as fruit of the poisonous tree. As discussed *supra* at page 273, the fruit of the poisonous tree doctrine applies only to evidence discovered as a result of the Government's infringement of a defendant's constitutional

rights. We must deny Winsett's petition if the Illinois courts reasonably could have concluded in 1987 that a *Miranda* violation did not support exclusion under the fruit of the poisonous tree doctrine.

*Miranda v. Arizona* created several "procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966). To underscore the obvious fact that the Court had no authority to create new constitutional rights, Chief Justice Warren indicated that these newly-prescribed protections shall exist "unless other fully effective means are devised to inform accused persons of their right to silence and to assure a continuous opportunity to exercise it. . . ." *Id.*; *see also* id. at 457, 86 S.Ct. at 1618 (describing the motivating force behind the decision as a "concern for adequate safeguards to protect precious Fifth Amendment rights"). The Court believed that compliance with these safeguards would reduce violations of defendants' Fifth Amendment rights or at least provide a bright-line presumption that would obviate the need to conduct difficult, fact-intensive voluntariness inquiries in which all facts, most likely, could never be known. It is important to see through the broad sweep of *Miranda* to the Court's ultimate pronouncement: *Until a better system is developed,* these safeguards should be employed to protect a defendant's Fifth Amendment rights. *See* id. at 467, 86 S.Ct. at 1624 ("[W]e cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted. Our decision in no way creates a constitutional straitjacket which will handicap sound efforts at reform, nor is it intended to have this effect."). Thus, while *Miranda* provided safeguards to defendants, those protections were not themselves constitutional rights.

The Court emphasized this distinction in two cases interpreting *Miranda* before 1987: *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), and *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Tucker*, a defendant accused of rape provided police with an alibi witness who, rather than exculpating the de-

fendant, contradicted the defendant's version of events and implicated him in the crime. 417 U.S. at 435–37, 94 S.Ct. at 2359–60. Even though this interrogation occurred before the announcement of *Miranda*, the defendant sought to exclude the witness's testimony at trial as a fruit of the poisonous tree because the police failed to issue the appropriate warnings during his interrogation. The Court rejected the defendant's fruit claim because the interrogating officers "did not abridge [Tucker's] constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by this Court in *Miranda* to safeguard that privilege." *Id.* at 446, 94 S.Ct. at 2364–65. The Court also added that "these procedural safeguards were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Id.* at 444, 94 S.Ct. at 2364.

The Court took another step down this road in *Elstad*. Police officers in that case willfully omitted the required warnings in their interrogation of a burglary suspect, who eventually made an inculpatory statement regarding his participation in the crime. Based on this statement, the officers took the suspect to the police station whereupon he received and waived his *Miranda* rights in the process of executing a second confession (this one in writing). *Elstad,* 470 U.S. at 300–01, 105 S.Ct. at 1288–89. The defendant in *Elstad* claimed that his written confession should have been excluded as a fruit of the poisonous tree because the earlier *Miranda* violation uncovered information that made subsequent denials seem futile.

The Supreme Court rejected this contention and held that the Fifth Amendment did not require suppression of the voluntary, second confession. *Id.* at 318, 105 S.Ct. at 1297–98. The Court in *Elstad* provided a cogent statement of the critical distinction between *Miranda* and Fifth Amendment violations:

> The Oregon court assumed and respondent here contends that a failure to administer *Miranda* warnings necessarily breeds the same consequences as police infringement of a constitutional right, so that evidence uncovered following an unwarned statement must be suppressed as "fruit of the poisonous tree." We believe this view misconstrues the nature of the protections afforded by *Miranda* warnings and therefore misreads the consequences of police failure to supply them.

*Id.* at 304, 105 S.Ct. at 1290. The Court went on to explicate this point in greater detail:

> The *Miranda* exclusionary rule . . . sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. . . . *Miranda*'s preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.  .

*Id.* at 306–07, 105 S.Ct. at 1291–92; see also *Michigan v. Payne*, 412 U.S. 47, 54, 93 S.Ct. 1966, 1970, 36 L.Ed.2d 736 (1973) (explaining that *Miranda* did not "confer[ ] a constitutional right that had not existed prior to [that] decision"). Utilizing this analytical framework, the Court noted that, while *Miranda* commands that a violative statement itself must be suppressed, the *Miranda* violation in *Elstad*'s case could not—without more—support exclusion of derivative evidence as a fruit of the poisonous tree. *Id.* at 308, 105 S.Ct. at 1292–93. The Court stated: "Since there was no actual infringement of [Elstad's] constitutional rights, the case was not controlled by the doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be suppressed." *Id.*[4]

---

**4.** This holding seemed to resolve the conflict created by an evenly-divided Court's affirmance of a 1977 Massachusetts Supreme Court decision. *Commonwealth v. White*, 374 Mass. 132, 371 N.E.2d 777 (1977), *aff'd. by an equally divided Court*, 439 U.S. 280, 99 S.Ct. 712, 58 L.Ed.2d 519 (1978). The Massachusetts court in White suppressed inculpatory evidence seized pursuant to a search warrant that the police obtained after the defendant spoke to police without validly waiving his *Miranda* rights. *Id.*, 371 N.E.2d at 781. At least two members of the Supreme Court, however, did not view *Elstad* as dispositive of the question of the admissibility of the evidentiary fruits of statements taken in violation of a defendant's *Miranda* rights. *See Patterson v. United States*, 485 U.S. 922, 108 S.Ct. 1093, 99 L.Ed.2d 255 (1988) (White & Brennan, JJ., dis-

The Supreme Court also recognized this dichotomy in a number of other cases before 1987. The Court held that a *Miranda* violation prevented introduction of a particular statement in the prosecution's case-in-chief, but that prosecutors could nevertheless use the statement as impeachment material unless it was involuntary under the Fifth Amendment. *Harris v. New York*, 401 U.S. 222, 225–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971). The *Harris* Court underscored the difference between the protections of *Miranda* and the Fifth Amendment by stating that it would be "an extravagant extension of the Constitution" to extend *Miranda*'s power of exclusion beyond the initial suppression of a violative statement. *Id.* at 226 n. 2, 91 S.Ct. at 646. *See also Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1987) ("[T]he *Miranda* Court adopted prophylactic rules designed to insulate the exercise of Fifth Amendment rights...."); *Moran v. Burbine*, 475 U.S. 412, 425, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410 (1986) ("The purpose of *Miranda* warnings instead is to ... guard against abridgement of the suspect's Fifth Amendment rights."); *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984) (citing approvingly *Tucker*'s recognition that "[r]equiring *Miranda* warnings before custodial interrogation provides 'practical reinforcement' for the Fifth Amendment right") (quoting *Tucker*, 417 U.S. at 444, 94 S.Ct. at 2364).[5] In a case factually similar to Winsett's, the Court extended its holding in *Harris* by allowing the prosecution to use for impeachment purposes a defendant's statement obtained after police willfully denied the defendant's request to consult counsel in

violation of his *Miranda* rights. *Oregon v. Hass*, 420 U.S. 714, 722, 95 S.Ct. 1215, 1220–21, 43 L.Ed.2d 570 (1975). Under Winsett's proposed reading of the Constitution, the determination of a *Miranda* violation in these cases should have settled the issue and rendered the subsequent voluntariness inquiries superfluous.

The opinions of both this Court and Illinois courts have followed, as they must, the Supreme Court's example. *See, e.g., Stawicki v. Israel*, 778 F.2d 380, 382 (7th Cir.1985) (noting that the Supreme Court has rejected a "fruit of the poisonous tree" analysis for *Miranda* violations where the defendant's statement is voluntary), *cert. denied*, 479 U.S. 842, 107 S.Ct. 150, 93 L.Ed.2d 91 (1986); *Hayes v. Cady*, 500 F.2d 1212, 1214–15 (7th Cir.) (refusing to exclude objects discovered as a result of an interrogation that violated *Miranda*), *cert. denied*, 419 U.S. 1058, 95 S.Ct. 642, 42 L.Ed.2d 655 (1974); *United States v. Oliver*, 505 F.2d 301, 304 (7th Cir. 1974) ("We recognize that the warnings specified in the Court's opinion in *Miranda* are not mandated by the Constitution itself ...."), *overruled on other grounds*, *United States v. Fitzgerald*, 545 F.2d 578 (7th Cir. 1976); *People v. White*, 61 Ill.2d 288, 335 N.E.2d 457, 462 (1975) ("The *Miranda* warnings are prophylactic measures designed to guard against infringement of the privilege against self-incrimination."), *cert. denied*, 424 U.S. 970, 96 S.Ct. 1469, 47 L.Ed.2d 738 (1976); *People v. Althide*, 71 Ill.App.3d 963, 27 Ill.Dec. 428, 433, 389 N.E.2d 240, 245 (1979) (stating that, because the defendant's statement to police was involuntary, "[w]e deal here not merely with a violation of the

---

senting from denial of certiorari) (stating that *Elstad* left open "the question of the admissibility of physical evidence yielded from a *Miranda* violation").

5.  Although it is not relevant to our survey of pre-1987 law, we note that the Supreme Court has continued to recognize the distinction between *Miranda* and Fifth Amendment violations. *See Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 2354–55, 129 L.Ed.2d 362 (1994) (describing the dichotomy between Fifth Amendment and *Miranda* rights); *McNeil v. Wisconsin*, 501 U.S. 171, 176, 111 S.Ct. 2204, 2207–08, 115 L.Ed.2d 158 (1991) (stating that *Miranda* rights are "prophylactic" protections of the Fifth

Amendment); *Michigan v. Harvey*, 494 U.S. 344, 351, 110 S.Ct. 1176, 1181, 108 L.Ed.2d 293 (1990) ("We have never prevented use by the prosecution of relevant voluntary statements by a defendant, particularly when the violations alleged by the defendant relate only to procedural safeguards that are 'not themselves rights protected by the Constitution,' but are instead measures designed to ensure that constitutional rights are protected.") (citation omitted); *Arizona v. Roberson*, 486 U.S. 675, 681, 108 S.Ct. 2093, 2097–98, 100 L.Ed.2d 704 (1988) (characterizing *Miranda* warnings as "prophylactic protections" of the Fifth Amendment privilege against self-incrimination).

**278**

'prophylactic rules' designed to protect a defendant's right against self-incrimination, but with a violation of that constitutional right itself").

Despite this apparent clarity in the law, an Illinois court in 1987 might have perceived some ambiguity regarding the nature of *Miranda*'s constitutional foundation. The first relevant set of cases concerned the Supreme Court's holding in *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), in which the Court established a bright-line rule that a court must suppress statements taken by police after a suspect in custody requests an attorney (unless the suspect re-initiates the communication). In *Edwards*, the Court held that the defendant's confession was inadmissible because police obtained it after the defendant's invocation of his right to counsel guaranteed by *Miranda*. *Edwards* seems at first glance to be merely another layer of protection for a suspect's Fifth Amendment rights.[6] The *Edwards* Court, however, described the protection it was creating in much broader terms: "*Miranda* thus declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation," *id.* at 482, 101 S.Ct. at 1883, and "[t]he Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation," *id.* at 485–86, 101 S.Ct. at 1885. *See also Oregon v. Bradshaw*, 462 U.S. 1039, 1043, 103 S.Ct. 2830, 2833, 77 L.Ed.2d 405 (1983) (describing the use of statements obtained in derogation of the *Edwards* rule as a "violat[ion] of the rights secured to the defendant by the Fifth and Fourteenth Amendments"). Indeed, the

Illinois Appellate Court granted Winsett's petition for post-conviction relief based on the Supreme Court's pre-*Edwards* statement in *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979), that "the Court fashioned in *Miranda* the rigid rule that an accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease." *See People v. Winsett*, 222 Ill.App.3d 58, 164 Ill.Dec. 673, 679, 583 N.E.2d 589, 595 (1991). In light of these descriptions of the *Miranda* right to counsel, and inasmuch as *Oregon v. Elstad* in 1984 concerned a failure to provide proper *Miranda* warnings rather than a violation of the *Edwards* protection, an Illinois court might have felt justified in concluding that an *Edwards* violation could sustain the exclusion of derivative evidence as fruit of the poisonous tree.

Confusing signals emanated from sources other than the Supreme Court. Soon after the Court announced the decision in *Edwards*, a panel of the First Circuit affirmed the suppression of physical evidence found as a result of a defendant's statements obtained in violation of his *Miranda* and *Edwards* rights. *United States v. Downing*, 665 F.2d 404, 405 (1st Cir.1981). An Illinois appellate court also clouded the waters by stating in dicta that "derivative evidence obtained as the result of a *Miranda* violation should be suppressed along with any statements made...." *People v. Creach*, 69 Ill.App.3d 874, 25 Ill.Dec. 886, 896, 387 N.E.2d 762, 772 (1979) (finding no *Miranda* violation), *overruled on other grounds*, 79 Ill.2d 96, 37 Ill. Dec. 338, 402 N.E.2d 228, *and cert. denied*,

---

**6.** Indeed, cases of the Supreme Court and our Court have cast the *Edwards* protection in this light. *See, e.g., Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 2354–55, 129 L.Ed.2d 362 (1994); *McNeil*, 501 U.S. at 176, 111 S.Ct. at 2208 (describing the Edwards rule as "a second layer of prophylaxis for the *Miranda* right to counsel"); *Harvey*, 494 U.S. at 350, 110 S.Ct. at 1180 ("*Edwards* thus established another prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights."); *Roberson*, 486 U.S. at 681, 108 S.Ct. at 2097 ("the prophylactic protections that the *Miranda* warnings provide ... are implemented by the application of the *Edwards* corollary"); *Barrett*, 479 U.S. at 528, 107 S.Ct. at 832 ("It remains clear, however, that [the Ed-

wards] prohibition on further questioning—like other aspects of *Miranda*—is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose."); *Solem v. Stumes*, 465 U.S. 638, 644 n. 4, 104 S.Ct. 1338, 1342 n. 4, 79 L.Ed.2d 579 (1984) ("*Edwards* did not confer a substantive constitutional right that had not existed before; it 'created a protective umbrella serving to enhance a constitutional guarantee.'") (quotation omitted); *Lord v. Duckworth*, 29 F.3d 1216, 1220 (7th Cir.1994) (noting that "neither *Miranda* nor *Edwards* were mandated by the Constitution," but that they both instead "stand as judicially-created safeguards designed to protect the right against compulsory self-incrimination").

449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 467 (1980).[7] Finally, our circuit once suppressed third-party testimony obtained as a result of a *Miranda* violation and a refusal to allow the defendant to contact his attorney. *United States ex rel. Hudson v. Cannon,* 529 F.2d 890, 892 (7th Cir.1976). The *Hudson* Court, though, concluded that the defendant's statements were also involuntary under the Fifth Amendment and resulted from a violation of the defendant's Sixth Amendment right to counsel recognized in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). *Hudson,* 529 F.2d at 893–94.[8]

We need not decide whether the Illinois courts in 1987 reasonably could have suppressed Spruille's testimony as the fruit of a *Miranda* violation. Our inquiry here is more constrained. For *Teague* purposes, we can grant relief only if the Illinois courts would have acted *unreasonably in refusing* to suppress Glenn Spruille's testimony, or, tracking the well-worn formula, whether suppression of his testimony was "dictated by precedent existing at the time [Winsett's] conviction became final." *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070.

We hold that the Illinois courts acted reasonably by refusing to suppress Spruille's testimony as a fruit of a *Miranda* violation. The law on this question may not have been completely settled, but the decisions of the Illinois courts were substantially justified. The relief Winsett seeks in this count of his petition, therefore, is a new rule. Unless we can say confidently that controlling precedent existing in 1987 compelled an opposite result, we must follow *Teague*'s command against announcing new rules of constitutional law on collateral review.

The third step of the *Teague* inquiry allows us to circumvent the general prohibition on announcing new rules if the rule sought by Winsett falls into one of two narrow categories. "The first exception permits the retroactive application of a new rule if the rule places a class of private conduct beyond the power of the State to proscribe" or "prohibit[s] a certain category of punishment for a class of defendants because of their status or offense." *Saffle v. Parks,* 494 U.S. 484, 494, 110 S.Ct. 1257, 1263, 108 L.Ed.2d 415 (1990). Winsett's petition does not seek this sort of relief. The second exception allows courts to apply retroactively "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.* at 495, 110 S.Ct. at 1264 (quoting *Teague,* 489 U.S. at 311, 109 S.Ct. at 1075). The case cited most frequently as illustrative of this principle is *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). *See Saffle,* 494 U.S. at 495, 110 S.Ct. at 1263.

A rule excluding the fruits of a *Miranda* violation does not qualify for this second *Teague* exception because it lacks the necessary connection to the fairness and accuracy of a trial. Adopting the rule sought by Winsett does not promise to save many innocent defendants from wrongful convictions and further the search for truth in criminal trials. The *Miranda* decision itself arguably might qualify as such a watershed rule because of its focus on eliminating unreliable confessions and its overall pathbreaking nature.[9] But

---

7. It should be noted, however, that both of these decisions preceded the Court's resolution of *Oregon v. Elstad* in 1984. *But see* note 4, *supra,* at 276–77.

8. The state courts hearing Winsett's case, by contrast, found only a violation of his prophylactic *Miranda* protections. *Hudson* does not stand for the proposition that a *Miranda* violation, standing alone, justifies suppression of its evidentiary fruits. In fact, the *Hudson* Court expressly stated the opposite rule:

> A majority of the Court (other than the author of this opinion) conclude that even where an interrogation occurs after the *Miranda* decision, and warnings required by it are not given, the deterrent effect of excluding third party

testimonial fruits of an otherwise voluntary statement is not sufficient to warrant exclusion. The majority would therefore extend *Tucker* to this case to the extent that petitioner's claim rests solely on omission of *Miranda* warnings.

529 F.2d at 895.

9. We note, though, that the Supreme Court did not apply its holding in *Miranda v. Arizona* retroactively. *See Jenkins v. Delaware,* 395 U.S. 213, 214, 89 S.Ct. 1677, 1677–78, 23 L.Ed.2d 253 (1969) (holding *Miranda* inapplicable to retrials of cases tried originally before the Court decided *Miranda*); *Johnson v. New Jersey,* 384 U.S. 719, 730, 86 S.Ct. 1772, 1779, 16 L.Ed.2d 882 (1966) (holding *Miranda* inapplicable to trials begun before the Court decided *Miranda*).

Winsett's proposed rule, at its most basic level, fails because the presence of evidentiary fruits of a confession most often indicates that the confession was accurate and supported in fact. *See Solem v. Stumes*, 465 U.S. 638, 644–45, 104 S.Ct. 1338, 1341–43, 79 L.Ed.2d 579 (1984) (denying retroactive effect to *Edwards v. Arizona* because, *inter alia*, a defendant's statements made to police after he requests counsel are not likely to be inaccurate or unreliable, and, if they are, the voluntariness standard provides adequate protection). Coerced, but accurate, confessions and their fruits are still excludable under the Fifth Amendment voluntariness standard. Winsett's rule would serve only to exclude the corroborative fruits of voluntary, accurate confessions.

We conclude, therefore, that Winsett is not entitled to a writ of habeas corpus on his fruit of the poisonous tree claim because the relief he seeks would be a new rule within the meaning of *Teague v. Lane*.

### B. Ineffective Assistance of Counsel(s)

Winsett presents two claims of ineffective assistance of counsel in his appeal. First, he alleges that his trial counsel should have contested the voluntariness of his statements to the police in addition to seeking suppression of the statements under *Miranda/Edwards*. Second, Winsett argues that his appellate counsel was unconstitutionally ineffective by failing to raise the fruit of the poisonous tree claim on direct appeal. Winsett's complaint about his trial counsel's performance appears for the first time in any of his post-conviction pleadings, and he submerged his reference to the ineffectiveness of his appellate counsel deep in his petition to the district court.

We cannot reach the merits of the first claim because Winsett did not present it in his petition to the district court. His petition concerned only the *Miranda* issue. For that matter, Winsett has not claimed to any court—state or federal—that his trial counsel

provided ineffective assistance. As we made clear earlier, our precedent unambiguously requires Winsett to present this claim to the district court before bringing it to our attention. *See supra* at 274; *see also Smith v. Fairman*, 862 F.2d 630, 635 (7th Cir.1988), *cert. denied*, 490 U.S. 1008, 109 S.Ct. 1645, 104 L.Ed.2d 160 (1989). We must therefore reject Winsett's claim of ineffective assistance of trial counsel.

■ The State argues that Winsett also failed to present his second ineffectiveness claim to the district court, but we have no trouble locating that claim in his single-count petition to the district court. Although his *pro se* petition is generally well-crafted, he lumped both of his claims of error into one count. He nevertheless did point out that his appellate counsel failed to argue the fruit claim on direct appeal, Petition for Writ of Habeas Corpus, No. 94 C 821, at 7, and he notes that "[t]he Illinois Supreme Court ... erroneously determined that the circuit court properly denied the petition for post-conviction relief because Petitioner was not deprived of the effective assistance of counsel on direct appeal." *Id.* at 8. We cannot agree with the State that Winsett waived this claim simply because he did not cast it as a separate count in his petition.[10] This is especially true in light of our mantra that "it is important to construe *pro se* filings liberally." *Coulter v. Gramley*, 93 F.3d 394, 397 (7th Cir.1996).

We employ familiar standards to resolve ineffective assistance of counsel claims. A petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, but for this deficient performance, "the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). It is often beneficial for courts to consider the prejudice prong of *Strickland*'s test before delving into murkier questions of whether certain acts or decisions constituted rea-

---

10. It is true that the district court did not explicitly consider this claim. The court's resolution of the fruit of the poisonous tree issue against Winsett, however, implicitly addressed and foreclosed his ineffectiveness claim relating to the failure

to raise such a claim on appeal; as we discuss *infra*, without a persuasive contention on appeal, he could not show the requisite prejudice to prevail on his Sixth Amendment claim.

sonable legal advocacy. In this case, Winsett must prove that the Illinois courts in 1987 would have found merit in the fruit of the poisonous tree claim that his appellate counsel neglected to raise. He cannot demonstrate the prejudice necessary to trigger a Sixth Amendment violation if his counsel merely failed to present an argument that would have failed anyway.

Our earlier survey of the relevant case law for *Teague* purposes should have foreshadowed our conclusion that Winsett cannot demonstrate that his fruit of the poisonous tree claim probably would have succeeded on direct appeal. The law at that time suggested strongly that, like other *Miranda* protections, the right under *Edwards* to have police cease a custodial interrogation when a defendant invokes his right to counsel is a prophylactic safeguard of the Fifth Amendment privilege against self-incrimination. The prevailing authority suggested, in other words, that *Miranda* and *Edwards* are extra-constitutional, not extra constitutional, protections. We cannot conclude that this fruit of the poisonous tree claim probably would have succeeded on direct appeal, especially in light of the rejection of this very same claim by the Supreme Court of Illinois in Winsett's petition for post-conviction relief. Thus, Winsett cannot demonstrate the necessary likelihood that raising the issue would have produced a different result on direct appeal.

### C.   Appointment of Counsel

■   As a final matter, Winsett finds fault with the district court's failure to rule on his · motion to appoint counsel. After the State filed a brief responding to his *pro se* petition, Winsett allowed the time to pass in which he could have filed a Reply Brief. Instead, eight days after the deadline to reply, Winsett filed a motion for appointment of counsel and stay of the briefing schedule. There was, however, no more briefing to be done at this point. The district court did not rule on Winsett's motion but instead issued its final decision a little over a month after receipt of the motion. Then–Judge Aspen addressed the motion in a footnote of his order:

After missing [t]he deadline for responding to the government's answer, Winsett

moved for appointment of counsel. Although we agree with petitioner that this issue presents a novel question of law that would ordinarily prompt us to grant such a request, our review of the law leads us to the conclusion that appointed counsel would add little to the analysis, particularly in light of the thorough and competing opinions emanating from the state courts. Accordingly, rather than delay resolution of this matter, we deny petitioner's motion for appointment of counsel.

*United States ex rel. Winsett v. Washington*, 860 F.Supp. 479, 486 n. 7 (N.D.Ill. 1994).

■   Appointing counsel for pro se petitioners in habeas corpus cases is a power commended to the discretion of the district court in all but the most extraordinary circumstances. *See* 18 U.S.C. § 3006A(a)(2)(B) ("Whenever ... the court determines that the interests of justice so require, representation may be provided for any financially eligible person who ... is seeking relief under section 2241, 2254, or 2255 of title 28."). This has been the law of our circuit for many years:

[A]ppointment of counsel for indigents in habeas corpus and section 2255 proceedings rests in the sound discretion of district courts unless denial would result in fundamental fairness impinging on due process rights.

*LaClair v. United States*, 374 F.2d 486, 489 (7th Cir.1967). We review the district court's refusal to appoint counsel, therefore, under an abuse of discretion standard and will reverse only "if, given the difficulty of the case and the litigant's ability, [Winsett] could not obtain justice without an attorney, [he] could not obtain a lawyer on [his] own, and [he] would have had a reasonable chance of winning with a lawyer at [his] side." *Forbes v. Edgar*, 112 F.3d 262, 264 (7th Cir.1997). In this context, the "reasonable chance of success" element of our review is less demanding than our ultimate assessment of the "reasonableness" of the state court's decision under *Teague* or under the newly-amended 28 U.S.C. § 2254(d)(1). Otherwise, we would create a cruel paradox in which we

would only grant relief to those petitioners who could already help themselves.

Winsett's due process claim must fail even under this more charitable standard. In essence, the district court simply chose to issue its ultimate ruling on the merits and deny Winsett's motion at the same time. We cannot conclude in this instance that this approach or the decision not to appoint counsel itself deprived Winsett of his right to due process. First, the district court's opinion does contain a ruling—albeit one contained in a footnote in the final order—on Winsett's motion. Second, Winsett forfeited any due process rights he may have had in this regard by filing his motion eight days after all briefs were due. Finally, as the district court noted, Winsett was not prejudiced by the refusal to appoint counsel after all briefs were submitted to the court; the well-reasoned opinions from the Illinois courts clearly elaborated the competing arguments and legal authority. The district court, therefore, did not deprive Winsett of due process of law.

## III. CONCLUSION

For all the foregoing reasons, we affirm the district court's denial of Winsett's petition for a writ of habeas corpus.