**Theodore J. LYONS, Petitioner–Appellee,**

v.

**Clarice STOVALL, Respondent–Appellant.**

No. 97–1894.

United States Court of Appeals, Sixth Circuit.

Argued: June 19, 1998

Decided and Filed: Aug. 24, 1999

---

Olga Agnello (argued and briefed), Office of the Prosecuting Attorney, County of Wayne, Detroit, Michigan, for Respondent–Appellant.

Todd Maybrown (argued and briefed), Allen, Hansen & Maybrown, Seattle, Washington, Kenneth M. Mogill (briefed),

Mogill, Posner & Cohen, Detroit, Michigan, for Petitioner–Appellee.

Before: MOORE, CLAY, and GILMAN, Circuit Judges.

CLAY, J., delivered the opinion of the court in Parts I.A., II.B., and II.C. below. GILMAN, J. (pp. 344–347), delivered the opinion of the court in Part I. of his concurring opinion. MOORE, J. (pp. 347–350), delivered a separate dissenting opinion.

## OPINION

CLAY, Circuit Judge.

Petitioner, Theodore J. Lyons, was convicted in August of 1987 of first-degree criminal sexual assault and sentenced to a term of ten to twenty-five years of imprisonment for the rape of a mentally retarded woman who was confined to a community living facility where Petitioner worked as a staff member. After unsuccessfully appealing his conviction to the Michigan appellate courts, Petitioner filed an application for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. The district court granted the petition, and ordered that the case be returned to the state forum for a new trial within 180 days. The state appealed, but did not move for a stay of the writ pending appeal. Petitioner moved for release pending the state's appeal; however, the district court denied Petitioner's motion based upon the severity of the offense and the strong likelihood of another conviction.

Because we find that Petitioner failed to exhaust his state court remedies, his case is not properly before us. However, in the interest of judicial economy, we will excuse Petitioner's lack of exhaustion and apparent procedural default because the evidentiary issue upon which he bases his federal constitutional claim seeks the retroactive application of a new rule of law which is barred under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Accordingly, we **REVERSE** the district court's order granting Petitioner's writ of habeas corpus.[1]

## BACKGROUND

In March of 1983, Petitioner began working at the Hull Road Community Living Facility, a home for the mentally retarded, in Belleville, Michigan. Petitioner was shift supervisor and provided direct care to the residents, including feeding, bathroom assistance, and general personal care. At that time, approximately two of the six residents and five of the ten staff members at the home were men. On June 22, 1983, the victim, Evangeline McKenzie, became a resident at the home. Ms. McKenzie was both mentally and physically disabled in that she was profoundly retarded with an IQ below twenty and suffered from muscular dystrophy. She could not talk, feed or bathe herself, or use the bathroom without assistance.

In December of 1983, Dr. Mindy Smith, a family practice physician, examined Ms. McKenzie because it had been reported that Ms. McKenzie was exhibiting unusual behavior such as repeatedly hitting her abdomen while making sounds—inasmuch as she could not speak words—and that Ms. McKenzie had gained weight in her abdominal area. Dr. Smith diagnosed Ms. McKenzie as being pregnant, and opined that Ms. McKenzie was hitting her abdomen likely because she could feel fetal movement. Based upon records kept at the facility indicating that Ms. McKenzie's last menstrual period had begun on June 15, 1983, as well as upon her physical examination of Ms. McKenzie's uterus and abdomen, and the results of an ultrasound examination, Dr. Smith determined that as of December 8, 1983, Ms. McKenzie was 20.5 weeks pregnant.

---

1. Judge Clay writes for the majority in reversing the district court's order granting Petitioner's application for writ of habeas corpus, and is joined by Judge Gilman in Parts I.A., II.B., and II.C. of the majority opinion.

Ms. McKenzie gave birth to a boy, Jonathan McKenzie, on March 24, 1984, and she died seven months later. Jonathan, who also was profoundly retarded, died in October of 1984. Dr. Karen Bartscht, a physician who assisted in Jonathan's delivery, opined that Jonathan was premature' and estimated that conception had taken place between June 15 and June 25, 1983. Dr. Bartscht had examined Ms. McKenzie on February 15, 1994, about six weeks before delivery, and determined that Ms. McKenzie was a few days over thirty weeks pregnant. At the time of delivery, Dr. Bartscht drew blood samples from Ms. McKenzie and Jonathan, and the samples were sent to the state police crime laboratory.

Inasmuch as Ms. McKenzie was unable to communicate, blood samples were taken from the facility's two male residents, the five male direct-care providers other than Petitioner, as well as from the facility's director, in an attempt to determine paternity. Comparison of these blood samples with that of Ms. McKenzie and Jonathan excluded these men as being the possible father. Petitioner refused to voluntarily provide a blood sample, so a search warrant was obtained, and a blood sample was drawn. Petitioner's blood, along with that of Ms. McKenzie and Jonathan, were sent to the National Legal Laboratory where human leukocyte antigen (HLA) tests revealed that the genetic markers in Petitioner's blood matched the genetic markers found in Jonathan's blood.[2] Based upon these findings, Petitioner was charged with first-degree criminal sexual assault.

At trial, the prosecution presented testimony from two expert witnesses, Dr. Walker and Dr. Gershowitz, to explain the HLA test results that each had performed. The experts each characterized the results of the tests in three different statistical forms: 1) the probability of exclusion, 2) the combined paternity index, and 3) the probability of paternity. Dr. Gershowitz and Dr. Walker opined that the probability of exclusion, which described the strength of the test by indicating its ability to exclude falsely accused men, was 95.5% and 99.5%, respectively. In other words, the experts opined that the results of the tests would exclude a falsely accused man with close to 100% accuracy. Except for Petitioner, the possibility of paternity was excluded as to all of the men tested in connection with this case. According to Dr. Walker, because it is not possible to prove paternity, the fact that Petitioner was not excluded as the father was "the most powerful evidence" in the case. Petitioner did not object to the admittance of the probability of exclusion evidence, and does not do so on appeal.

The combined paternity index expressed the likelihood that Petitioner was the father as opposed to a random man based upon the same genetic markers. Dr. Gershowitz described this test as an "odds statement." Specifically, he opined that "[i]t's the odds that this man is the father of this child compared to any other man in the population who might have been able to contribute the requisite genes." Dr. Gershowitz's test results indicated that the combined paternity index for Petitioner in this case was 303.8 to 1; or, put differently, Petitioner was about 304 times more likely to be Jonathan's father than a random man. Dr. Walker reported that, based upon his testing, Petitioner's combined paternity index was 429 to 1, or that Petitioner was 429 times more likely to be Jonathan's father than a random man. Petitioner did not object to the introduction of the combined paternity index statistics, and does not do so on appeal.

The probability of paternity statistics were based upon the same test results from the same genetic markers, but were expressed in terms of percentages as op-

---

**2.** The genetic markers were described to the jury as "attributes that we inherit from our parents much like eye color, hair color, but they are invisible factors in the blood that we can detect with laboratory tests." (J.A. at 360, testimony by Dr. Walker.)

posed to odds. Dr. Gershowitz converted the 303.8 to 1 combined paternity index odds found by his testing to a probability of paternity percentage of 99.7%. Dr. Walker converted the 429 to 1 combined paternity index odds found by his test results into a probability of paternity expression of 99.76%. The experts made it known to the jury that the probability of paternity percentages were calculated on the underlying mathematical assumption that Petitioner had had sexual intercourse with Ms. McKenzie; that the percentages had to be viewed and weighed by the jury in light of the other evidence admitted; and that if it were a known fact that Petitioner did not have sexual intercourse with the victim, the value of the probability of paternity would be zero percent. It is the probability of paternity statistics to which Petitioner objected at trial, and objects to on appeal.

Petitioner was convicted by a jury of first-degree criminal sexual assault and sentenced to a term of ten to twenty-five years' imprisonment. Petitioner appealed his conviction, and the Michigan Court of Appeals affirmed. Petitioner sought leave to appeal his conviction to the Michigan Supreme Court; however, his application was denied. Petitioner then filed for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan, raising the following two issues:

I. WERE PETITIONER'S RIGHTS TO THE PRESUMPTION OF INNOCENCE AND TO TRIAL BY JURY EVISCERATED BECAUSE OF THE INTRODUCTION OF HIGHLY PREJUDICIAL TESTIMONY AND ARGUMENT REGARDING THE PURPORTED STATISTICAL PROBABILITY OF PETITIONER'S PATERNITY?

II. WERE PETITIONER'S RIGHTS UNDER THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS VIOLATED BECAUSE OF THE PROSECUTOR'S CROSS–EXAMINATION WHICH SUGGESTED THAT PETITIONER WAS GUILTY BECAUSE THE POLICE WERE REQUIRED TO SEEK A SEARCH WARRANT TO OBTAIN HIS BLOOD?

United States Magistrate Judge Marc Goldman recommended that the petition be granted because 1) calculation of the so-called "probability of paternity" statistics by the experts depended on an underlying mathematical assumption that Petitioner had had sexual intercourse with Ms. McKenzie, and 2) the prosecutor's question on cross-examination regarding Petitioner's refusal to provide a blood sample without a warrant was in violation of Petitioner's Fourth Amendment rights. On July 30, 1997, United States District Judge Barbara Hackett issued an order accepting the magistrate's report and recommendation, and granting the writ of habeas corpus. The state filed this timely appeal.

## ANALYSIS

### I. *Failure to Exhaust State Court Remedies*

#### A.

The exhaustion provision of 28 U.S.C. § 2254 reflects a policy of federal-state comity, and requires a federal habeas petitioner to "fairly present" to the state courts the "substance" of his federal habeas claim prior to seeking such relief. *Picard v. Connor*, 404 U.S. 270, 275–78, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *see Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982). "The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). "Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies. Accordingly, we have re-

quired a state prisoner to present the state courts with the same claim he urges upon the federal courts." *Picard,* 404 U.S. at 276, 92 S.Ct. 509. "A rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional error." *Rose,* 455 U.S. at 518–19, 102 S.Ct. 1198. The exhaustion requirement "serves to minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights." *Duckworth v. Serrano,* 454 U.S. 1, 3, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981) (per curiam).

In *Kilby v. Jones,* 809 F.2d 324, 325 (6th Cir.1987), this Court found that a petitioner had failed to exhaust his state court remedies when he argued in state court that "his court-appointed trial counsel provided constitutionally ineffective legal assistance because he 'delegated' to counsel for a codefendant the 'factual investigation

prior to trial,'" but argued in federal court that his counsel was ineffective in conducting the trial itself as well as in handling his motion to suppress. This Court held that because the basis for the petitioner's ineffective assistance of counsel claim as argued in the federal courts was not the same basis as argued in the state courts, the petitioner had not exhausted his state court remedies. *Id.*

■ Similarly, in the instant case, although Petitioner raised the evidentiary claim to the state appellate courts, he argued it on the basis that he was denied his Fourteenth Amendment right to a fair trial because the evidence was more prejudicial than probative, not because the evidence violated the presumption of innocence as he argues to the federal courts.[3] As such, the Michigan state appellate courts were denied a fair opportunity to consider and pass on the error that Petitioner claims in federal court—that the use of evidence that assumes guilt violates the presumption of innocence.[4] *Picard,*

---

3. Specifically, Petitioner framed his question presented on this issue in his brief to the Michigan Court of Appeals, as well as in his brief for application for leave to appeal to the Michigan Supreme Court, as follows:

> Whether defendant was deprived of his right to due process and to a fair trial under the 14th Amendment to the United States Constitution and under Section 17, Article 1, Michigan Constitution 1963 when the trial court admitted into evidence over objection testimony concerning the statistical probability of defendant's paternity of the child.

Brief for Defendant–Appellant on Appeal to the Michigan Court of Appeals at v, 20–29, *People v. Lyons,* No. 147006 (Mich. Ct.App. April 13, 1994); Brief for Defendant–Appellant on Application for Leave to Appeal to the Michigan Supreme Court at vii, 38–46, *People v. Lyons,* No. 99452 (Mich. Jan. 13, 1995). Furthermore, in the body of his briefs to the Michigan appellate courts, Petitioner argued that his right to due process and a fair trial was violated solely on the basis that the evidence was more prejudicial than probative. *See id.*

Although Petitioner's briefs which were submitted to the state appellate courts were not included in the Joint Appendix submitted

in connection with this appeal, it is well-settled that "[f]ederal courts may take judicial notice of proceedings in other courts of record" and we have done so here by obtaining Petitioner's state appellate briefs from the Michigan appellate courts. *See Granader v. Public Bank,* 417 F.2d 75, 82–83 (6th Cir. 1969) (collecting cases), *cert. denied,* 397 U.S. 1065, 90 S.Ct. 1503, 25 L.Ed.2d 686 (1970); *see also Rodic v. Thistledown Racing Club, Inc.,* 615 F.2d 736, 738 (6th Cir.1980).

4. Petitioner does not claim that the alleged violation of his presumption of innocence infringed upon his Fourteenth Amendment right to a fair trial. Rather, Petitioner's habeas claim on this issue is based solely on the alleged violation of his presumption of innocence, standing alone. Because this Court will grant habeas relief only when the petitioner demonstrates actual prejudice in a state court proceeding to the extent that his trial "was rendered fundamentally unfair by a violation of the Constitution," *Norris v. Schotten,* 146 F.3d 314, 323 (6th Cir.1998), in Judge Clay's view, it is questionable whether Petitioner's evidentiary claim, even if considered on the merits and found to be meritorious, would constitute grounds for reversible error because the presumption of innocence is not, in and of itself, an express constitution-

404 U.S. at 276, 92 S.Ct. 509; *Kilby*, 809 F.2d at 325; see *Pillette v. Foltz*, 824 F.2d 494, 497–98 (6th Cir.1987) (finding that the "doctrine of exhaustion requires that the same claim under the same theory be presented to state courts before raising it in a habeas petition," and that the petitioner had not exhausted his state remedies because he based his claim of ineffective of assistance of counsel in the state courts on different grounds than he asserted in the federal courts).

■ Normally, Petitioner's failure to exhaust his state court remedies on the evidentiary claim would require dismissal of his entire petition. *See Rose*, 455 U.S. at 522, 102 S.Ct. 1198 (holding that a federal district court must dismiss a state habeas petitioner's writ containing both unexhausted and exhausted claims). However, in *Granberry v. Greer*, 481 U.S. 129, 131–32, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987), the Supreme Court held that although there is a strong presumption in favor of requiring a petitioner to exhaust his available state court remedies, the failure to do so is not an absolute bar to appellate consideration of his petition—i.e., the doctrine of exhaustion is discretionary, not jurisdictional. For example, as in this case, where the state fails to raise the defense, the appellate court should "determine whether the interest of comity and federalism will be better served by addressing the merits forthwith or by requiring a series of additional state and district court proceedings before reviewing the merits of the petitioner's claim." *Id.* at 134, 107 S.Ct. 1671. Furthermore, it has been found that where "the federal constitutional claim was plainly meritless and it would be a waste of time and judicial resources to require exhaustion," nonexhaustion and procedural default should be excused.[5] *Cain v. Redman*, 947 F.2d 817, 820 (6th Cir.1991) (citing *Prather v. Rees*, 822 F.2d 1418, 1422 (6th Cir.1987)).

■ In *Cain v. Redman*, this Court held that it was in the interest of judicial economy for the Court to hear the case before it "in spite of the unresolved issues of exhaustion and procedural default [because,] [a]lthough petitioner's federal constitutional claim [was] not plainly meritless, ... it [could] not withstand the hurdle of the rule of *Teague v. Lane*, which forbids retroactive application of new rules of law." 947 F.2d at 820. The Court reasoned that a remand to the district court for a hearing on exhaustion and procedural default would be a waste of time because even if these issues were decided in the petition-

---

al right. *See, e.g., Sandstrom v. Montana*, 442 U.S. 510, 524, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Kentucky v. Whorton*, 441 U.S. 786, 789, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979).

**5.** Under Michigan law, Petitioner has procedurally defaulted on his evidentiary claim inasmuch as he "may not file an application for leave to appeal from a judgment of conviction and sentence if [he] has previously taken an appeal from that judgment by right or leave granted or has sought leave to appeal that was denied." MICH. CT. R. 7.205(F); *see Harris v. Reed*, 489 U.S. 255, 269–70, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (O'Connor, J., concurring) (stating that "where a claim raised on federal habeas has never been presented to the state courts at all, ... federal courts quite properly look to, and apply, state procedural default rules in making the congressionally mandated determination whether adequate remedies are available in state court"); *see also Lambrix v. Singletary*, 520 U.S. 518, 522–25, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (noting that "[a] State's procedural rules are of vital importance to the orderly administration of its criminal courts; when a federal court permits them to be readily evaded, it undermines the criminal justice system," and therefore, it is wise to consider a procedural bar first in adjudicating a habeas petition except where judicial economy would be served in giving a *Teague* issue priority). Because Petitioner previously appealed his conviction as of right to the Michigan Court of Appeals and filed an application for leave to appeal to the Michigan Supreme Court, he would be procedurally barred from appealing his evidentiary claim to the Michigan appellate courts at this time. *See* MICH. CT. R. 7.205(F). As such, further review of his claim in the federal system would be barred in the absence of cause and prejudice. *See Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). *See* discussion *infra* Part I.B.

er's favor, this Court would still be barred from hearing the merits of the petitioner's constitutional claim inasmuch as the petitioner relied upon a new rule of law that could not be applied retroactively on federal habeas review.[6]  *Id.* Likewise, because Petitioner in this case seeks retroactive application of a new rule of law, in the interest of judicial economy, Petitioner's lack of exhaustion and apparent procedural default shall be excused where a hearing on cause and prejudice would be futile.

## B.

If it were not for the application of *Teague* to this case, in the interest of comity Petitioner's application for writ of habeas corpus would be dismissed. As noted, the exhaustion requirement is grounded in principles of comity, such that the states should have the first opportunity to adjudicate and possibly correct an alleged violation of a state prisoner's federal constitutional right.  *See Rose,* 455 U.S. at 515, 102 S.Ct. 1198; *Norris v. Schotten,* 146 F.3d 314, 323 (6th Cir.1998) (noting that a federal court may issue a writ of habeas corpus to correct a constitutionally infirm state court conviction "[u]pon [the] petitioner's exhaustion of available state remedies. . . ."). The Supreme Court explained the exhaustion doctrine, and the role comity plays in its enforcement, as follows:

> Because it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation, federal courts apply the doctrine of comity, which teaches that one court should defer action on causes properly within its jurisdiction until the

courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.

*Rose,* 455 U.S. at 518, 102 S.Ct. 1198 (internal quotation marks and citations omitted); *see* BLACKS LAW DICTIONARY 267 (6th ed.1990) (defining "comity" as that where "courts of one state or jurisdiction will give effect to laws and judicial decisions of another state or jurisdiction, not as a matter of obligation but out of deference and mutual respect"). In *Prather v. Rees,* 822 F.2d 1418, 1422 (6th Cir.1987), we stated that all other considerations aside, such as judicial efficiency, "if we thought that our disposition [of a petition] would negatively impact federal-state comity, we would dismiss for lack of exhaustion." In this case, the state has continually argued that the evidentiary claim raised by Petitioner is solely a matter of state law.

It is true that where a full trial has been held in the district court and it is evident that a miscarriage of justice has occurred, nonexhaustion should be excused.  *See Granberry,* 481 U.S. at 135, 107 S.Ct. 1671. However, in this case, although the district court granted Petitioner's application for writ of habeas corpus, the court also refused to release Petitioner from jail pending appeal of the district court's decision due to the severity of the offense and the strong likelihood of another conviction. Thus, Petitioner's rights would not be offended by failing to excuse his nonexhaustion.  *See, e.g., O'Neal v. McAninch,* 513 U.S. 432, 442, 115 S.Ct. 992, 130 L.Ed.2d 947 (noting that under habeas review, we "are dealing . . . with an error of constitutional dimension—the sort that risks an unreliable trial outcome and the consequent conviction of an innocent person").

---

6.  The "new rule" of law the petitioner in Cain sought to be retroactively applied was that espoused by the Supreme Court in *Sandstrom v. Montana,* 442 U.S. 510, 524, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); namely, that jury instructions containing a presumption indicating that one intends the consequences of his voluntary actions are unconstitutional be-

cause they abridge the principles of presumption of innocence and allocation of burden of proof thereby depriving a defendant due process of law.  *See Cain,* 947 F.2d at 819–22. Petitioner in the instant case seeks retroactive application of a similar new rule based upon an abridgment of the presumption of innocence.

In *Prather*, this Court excused the petitioner's failure to exhaust and addressed the merits of his constitutional claims for the following reasons:

> Because [the petitioner's] petition is so plainly meritless, addressing the merits of his claim will be efficient and will not offend federal-state comity. Efficiency includes bringing criminal litigation to a final conclusion. To return this case to the district court for a hearing on exhaustion, possible state post-conviction remedies, and perhaps still another habeas corpus proceeding, would greatly and wastefully expend judicial resources. Even so, if we thought our disposition would negatively impact federal-state comity, we would dismiss for lack of exhaustion. But where, as here, the petition is meritless, the state's attorney concedes the issue of exhaustion, and our disposition will not affect the state court's decision, comity and efficiency are served, not offended.

822 F.2d at 1422. Here, however, any decision to excuse Petitioner's failure to exhaust is inapposite to *Prather* in that it supports an inverse proposition. That is to say, a decision to excuse Petitioner's failure to exhaust and apparent procedural default to find Petitioner's evidentiary claim meritorious thereby *would affect* the state court's decision, and comity and efficiency would be *offended*, not served. *See O'Guinn v. Dutton*, 88 F.3d 1409, 1411–13 (6th Cir.1996) (*per curiam en banc*).

Furthermore, it appears that a hearing to determine cause for and prejudice due to the apparent procedural default would be futile despite the application of *Teague*. *See supra* note 5. To satisfy the cause requirement, a habeas petitioner must make "a showing of some external impediment preventing counsel from constructing or raising the claim." *Murray v. Carrier*, 477 U.S. 478, 492, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not con-stitute cause for a procedural default." *Id.*; *see Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Here, Petitioner raised a challenge to the evidence in question in the state appellate courts; however, he failed to base his challenge on the grounds upon which he rests on appeal. His failure to recognize these alternative grounds or failure to raise them despite recognizing them below, cannot constitute cause. *Carrier*, 477 U.S. at 492, 106 S.Ct. 2639. Prejudice may be shown if the constitutional error "had a substantial and injurious effect or influence on the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Petitioner did not suffer prejudice from the admittance of this evidence. Likewise, the facts of this case do not present the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent," thereby allowing us to excuse the lack of cause and prejudice. Carrier, 477 U.S. at 496, 106 S.Ct. 2639.

Accordingly, it appears that Petitioner's evidentiary claim would be barred from our review even without the application of *Teague v. Lane*.

## II. *Evidentiary Claim Barred by Teague v. Lane*

### A.

In *Teague v. Lane*, 489 U.S. 288, 316, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the Supreme Court held "that habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to *all* defendants on collateral review...." The Court has made it clear that the application of *Teague*, while being a threshold question in a federal habeas case, "is not 'jurisdictional' in the sense that [federal courts] ... must raise and decide the issue sua sponte." *Collins v.*

*Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). Conversely, the Court has also made it clear that, if raised, a federal court *must* apply *Teague*:

> We have recognized that the nonretroactivity principle "is not 'jurisdictional' in the sense that [federal courts] . . . must raise and decide the issue *sua sponte.*" *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990). . . . *But if the State does argue that the defendant seeks the benefit of a new rule of constitutional law, the court must apply Teague before considering the merits of the claim. Graham v. Collins,* 506 U.S. 461, 466–67, 113 S.Ct. 892, 897–898, 122 L.Ed.2d 260 (1993).

*Caspari v. Bohlen,* 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (emphasis added). However, until recently, the Court had not provided the lower courts with guidance as to what procedural formalities were necessary to constitute a properly raised *Teague* claim. *See* Marc M. Arkin, *The Prisoner's Dilemma: Life in the Lower Federal Courts After Teague v. Lane,* 69 N.C.L.Rev. 371, 416 (1991). Indeed, in the aftermath of *Teague,* the circuits have grappled with what procedural requirements were necessary for a state to preserve its *Teague* argument—i.e., what procedural requirements were necessary to render the Court's application of *Teague* mandatory. *See, e.g., Wilmer v. Johnson,* 30 F.3d 451, 454–55 (3rd Cir. 1994); *Epperly v. Booker,* 997 F.2d 1, 9 n. 7 (4th Cir.1993); *Jordan v. Ducharme,* 983 F.2d 933, 936 (9th Cir.1993); *Williams v. Dixon,* 961 F.2d 448, 457–59 (4th Cir.1992); *Boardman v. Estelle,* 957 F.2d 1523, 1534–37 (9th Cir.1992).

Then, in the case of *Goeke v. Branch,* 514 U.S. 115, 115 S.Ct. 1275, 131 L.Ed.2d 152 (1995), the Supreme Court brought clarity to the confusion by definitively announcing the procedural prerequisites necessary for a properly raised *Teague* claim. In *Goeke,* the habeas petitioner appealed

to the Eighth Circuit, arguing that she had stated a procedural due process violation, and that the district court's denial of her petition should therefore be reversed. *Id.* at 117, 115 S.Ct. 1275. At oral argument, the panel suggested that the petitioner's claim may have actually been based on substantive due process grounds, rather than procedural due process grounds. *Id.* The petitioner's counsel "welcomed the suggestion" and argued the substantive due process claim before the court. *Id.* This was the first time that the substantive due process argument was raised and argued. *Id.* In turn, the state argued that any substantive due process argument was barred by the application of *Teague. Id.* The record indicated that several questions and answers were exchanged at oral argument by the state and the panel regarding the application of *Teague* to the substantive due process claim. *Id.* at 118, 115 S.Ct. 1275. Thereafter, the Eighth Circuit held that the petitioner's substantive due process rights had been violated, and reversed the district court's decision without addressing the state's *Teague* claim. *Id.* at 117, 115 S.Ct. 1275. Then, after denying the state's motion for rehearing *en banc,* the majority modified its opinion to explain that it had not confronted the applicability of *Teague* to the petitioner's claim because the state had waived the issue. *Id.* (citing *Branch v. Turner,* 37 F.3d 371, 374–75 (1994)).

The Supreme Court granted certiorari and reversed the Eighth Circuit, finding that the state had preserved the *Teague* argument as applied to the petitioner's substantive due process claim, even though the claim was addressed for the first time at oral argument. *Id.* at 118, 115 S.Ct. 1275. The Court reasoned that because the state had made efforts to "alert the Eighth Circuit to the *Teague* problem [so as to] provide[ ] the court with ample opportunity to make a reasoned judgment on the issue, . . . the state did not waive the *Teague* issue."[7] *Id.* In short, *Goeke*

---

7. Although the state had raised its *Teague*

claim as applied to the procedural due pro-

now makes it clear that a federal court's *sua sponte* application of *Teague* is discretionary; however, when raised by the state, a federal court's application of *Teague* is mandatory, even when raised for the first time at the first hearing on appeal as long as the state provides the appellate court with ample opportunity to make a reasoned judgment on the issue.

This conclusion is supported by a decision from the Court of Appeals for the Second Circuit. In *Ciak v. United States*, the Second Circuit was asked to consider whether the district court erred in denying the petitioner a writ of habeas corpus under the automatic reversal rule, where the trial judge failed to inquire into the possible conflicts of interest of the petitioner's trial counsel. 59 F.3d 296, 301 (2d Cir. 1995). The state argued that the automatic reversal rule was not applicable because the rule only applied to cases on direct appeal. *Id.* The state did not, however, argue that the automatic reversal rule could not be applied to the petitioner's case under *Teague*. *Id.* at 302. In analyzing whether the district court erred in denying the writ, the Second Circuit found that the state had waived a *Teague* claim under *Goeke* because it "did not argue *in its brief or at oral argument* that *Teague* bar[red] application of the automatic reversal rule." *Ciak*, 59 F.3d at 302 (citing *Goeke*, 514 U.S. at 118, 115 S.Ct. 1275) (emphasis added). In other words, under *Goeke*, the *Ciak* Court would not have considered a *Teague* argument waived had the state raised the claim in its brief on appeal or at oral argument before the Court, even though the state had not raised *Teague* in the district court.

In fact, authority existed "pre *Goeke*" to support the same conclusion. In a habeas appeal to the Court of Appeals for the Fourth Circuit, the Court found that the state had waived its *Teague* argument "by its failure to raise the issue at the district

court level *or* at the first hearing before this court." *Williams v. Dixon*, 961 F.2d 448, 459 (4th Cir.), *cert. denied*, 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992) (emphasis added). By using the disjunctive "or" as opposed to the conjunctive "and," the Fourth Circuit expressly found that it would have considered a *Teague* argument raised for the first time at the first hearing before the Court. Therefore, authority existed before *Goeke* was decided to support the proposition that a state need not necessarily raise a *Teague* claim at the district court level in order to preserve the issue for appellate review.

Accordingly, in the instant case, the state properly preserved its *Teague* claim for our review because the state argued in both its brief on appeal to this Court as well as at oral argument that the application of *Teague* barred the relief sought. For example, at oral argument, the state argued its *Teague* claim as follows:

> THE STATE:[I]t would seem then that if there is no federal case on point, then this evidence is inadmissible, then under *Teague v. Lane*, this would be a new rule.

> THE COURT:

> (Moore, J.)Did you raise your *Teague* argument earlier?

> THE STATE:No, but I would say this about it. In the district court I did not. I say it's not analogous to a default argument as the petitioner argues because it's not something that can be waived. It doesn't involve the questions of federalism and comity. It's an administrative rule actually. Administrative in the sense that it's the way that the Supreme Court says that we will handle these cases of new rules. So, I didn't say that, but I think it's subsumed in my argument when I say that this is not a federal question and I

cess claim in the district court, it did not raise or argue its application to the legally distinct substantive due process claim at the district

court level. *Goeke*, 514 U.S. at 118, 115 S.Ct. 1275.

have consistently said that before the magistrate, the district court, this is not a federal question, it is a state evidentiary question. But also, the magistrate when he made his ruling, well the petitioner argued in response to me that the legal landscape would have required application of this rule and the legal landscape that he's referring to are those four state cases, which was also the basis for the magistrate's ruling. But three of those four cases were decided as a matter of state evidentiary law, only one of them—a Connecticut case—deals with federal constitutional matters. That was overlooked by the magistrate. Also, the fact that the dissenting justice of the Wisconsin Supreme Court noted that there were various jurisdictions that do permit the admissibility of this probability testimony, at least four of them I think the dissenting justice noted.

THE COURT:

(Moore, J.)Counsel, you've used your full 15 minutes.

THE STATE:Thank you.

THE COURT:

(Moore, J.)Thank you.

*Lyons v. Stovall,* 188 F.3d 327, Oral Argument by Respondent, June 19, 1998. In addition, Petitioner responded to the state's *Teague* claim in his brief on appeal to this Court, and argued why he believed that *Teague* did not bar his evidentiary claim. *See* Petitioner–Appellee's Final Brief on Appeal at 23–31. Accordingly, the record indicates that the state's efforts to alert this Court to the *Teague* problem "provided th[e] court with ample opportunity to make a reasoned judgment on the issue." *Goeke,* 514 U.S. at 118, 115 S.Ct. 1275. Thus, under *Goeke,* and as reinforced by *Ciak* and *Williams,* it is clear that the state properly raised and preserved its *Teague* claim, albeit for the first

time on appeal; as such, this Court's application of the rule is mandatory. *See Caspari,* 510 U.S. at 389, 114 S.Ct. 948. Furthermore, as noted *infra* in this discussion, the improvidence of advancing new rules of law on collateral review provides support for finding that the preservation of *Teague*'s application should not be limited or held to wooden literalness. *See Solem v. Stumes,* 465 U.S. 638, 654 n. 4, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984) (Powell, J., concurring).

■ However, relying upon *Sinistaj v. Burt,* 66 F.3d 804, 805 n. 1 (6th Cir.1995) and *Kordenbrock, v. Scroggy,* 919 F.2d 1091, 1104 n. 4 (6th Cir.1990) (*en banc*), Petitioner claims that the state waived its *Teague* argument inasmuch as the state failed to raise this argument either to the magistrate judge or in its objections to the magistrate judge's report and recommendation that it submitted to the district judge. In light of Supreme Court precedent, the cases relied upon by Petitioner are distinguishable and ill-decided. For example, the case at hand is distinguishable from *Kordenbrock.* In that case, this Circuit found that the state's failure to raise a *Teague* argument at *any* stage of the proceeding constituted a waiver of the argument. 919 F.2d at 1104 n. 4. True enough, a federal court may exercise its discretion and consider a *Teague* argument waived if not raised by the state at all; however, it is equally true that, once raised, a federal court *must* apply *Teague. See Caspari,* 510 U.S. at 389, 114 S.Ct. 948. Accordingly, although *Kordenbrock* was properly decided in that *Teague* was never raised by the state, it is also distinguishable from the facts of the instant case, and Petitioner's reliance on *Kordenbrock* is thus misplaced.

Furthermore, Petitioner's reliance on *Sinistaj* is misplaced because that case was wrongly decided in light of *Goeke.* In *Sinistaj,* a case decided "post-*Goeke,*" a panel of this Court held that the state waived its *Teague* argument because it raised the issue for the first time in its motion to amend the district court's judg-

ment. 66 F.3d at 806 n. 1. The *Sinistaj* court relied upon *Caspari* in support of its finding. *Id.* However, *Caspari* simply states that a federal court need not raise and decide *Teague sua sponte.* 510 U.S. at 389, 114 S.Ct. 948. *Goeke*, on the other hand, specifically states that *Teague* need only be raised by the state to the extent that it allows the appellate court ample opportunity to make a reasoned judgment before *Teague*'s application is mandatory—even when the state raises *Teague* for the first time at the first hearing before the appellate court. 514 U.S. at 117–18, 115 S.Ct. 1275. Therefore, inasmuch as *Goeke* had already been decided at the time the *Sinistaj* court rendered its decision, *Sinistaj* is in direct contravention to Supreme Court precedent, and Petitioner's reliance on *Sinistaj* is also misplaced and unfounded.

■ Accordingly, in the case at hand, having found that the state properly preserved its *Teague* argument, and that *Teague* must therefore be applied, it is dispositive. As argued by the state, any decision announcing that the presumption of innocence is violated by the use of evidence which assumes a statistical probability of guilt would be a "new rule" under *Teague*, and therefore cannot be used as grounds for granting the petition for habeas relief.[8]

### B.

Under *Teague*, "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301, 109 S.Ct. 1060. "To put it differ-

ently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Id.* In determining whether the relief requested would constitute a new rule, the question becomes " 'whether a state court considering [the petitioner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.' " *Caspari*, 510 U.S. at 390, 114 S.Ct. 948 (quoting *Saffle v. Parks*, 494 U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990)).

There are two exceptions to *Teague*'s general proposition that new rules should not be applied retroactively to cases on collateral review. The first exception applies to those rules that "plac[e] certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe."[9] *Teague*, 489 U.S. at 307, 109 S.Ct. 1060 (internal quotation marks omitted). The second exception to *Teague*'s nonretroactivity permits the application of " 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 495, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) (quoting *Teague*, 489 U.S. at 311, 109 S.Ct. 1060). "A rule that qualifies under this exception must not only improve accuracy, but also alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Sawyer v. Smith*, 497 U.S. 227, 242, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (internal quotation marks and citations omitted). This exception encom-

---

8. Furthermore, irrespective of the state's preservation of its *Teague* defense, based upon the new rule proposed by Petitioner, if ever there was a time for this Court to raise and decide a *Teague* claim *sua sponte*, surely it is here. *See Caspari*, 510 U.S. at 389, 114 S.Ct. 948 (citing *Schiro v. Farley*, 510 U.S. 222, 228–29, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994)) ("a federal court may, but need not, decline to apply *Teague* if the State does not argue it," i.e., a federal court's decision

whether to apply *Teague* when not raised by the state is discretionary).

9. It is undisputed that this exception is inapplicable here. The new rule proposed by Petitioner, that the use of evidence that assumes a statistical probability of guilt violates the presumption of innocence, does not "decriminalize" any class of proscribed conduct. *See Gilmore v. Taylor*, 508 U.S. 333, 342, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993).

passes a "small core of rules requiring 'observance of those procedures that ... are implicit in the concept of ordered liberty.'" *Graham v. Collins,* 506 U.S. 461, 478, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993) (quoting *Teague,* 489 U.S. at 311, 109 S.Ct. 1060) (internal quotation marks omitted). The rule espoused in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), that a defendant has the right to be represented by counsel in all criminals trials for serious offenses, is often cited as an example of a rule falling within this exception, although the precise contours of this exception may be difficult to discern. *See Saffle,* 494 U.S. at 495, 110 S.Ct. 1257.

Here, although Petitioner argues that the state waived its *Teague* argument, he also contends that should the Court find otherwise, the application of *Teague* does not bar the relief sought because the district court did not state a new rule of law in holding that probability evidence which assumes a statistical probability of guilt violates the presumption of innocence; and that, even assuming that a new rule was espoused, it falls into *Teague*'s second exception for nonretroactivity. Both of Petitioner's contentions are meritless.

■ First, the district court clearly set forth a "new rule" under *Teague* because the Michigan appellate courts had no legal basis at the time that they adjudicated Petitioner's case to feel "compelled by existing precedent to conclude that the rule [Petitioner sought] was required by the Constitution." *Saffle,* 494 U.S. at 488, 110 S.Ct. 1257. Precedents which "inform or even control or govern" the intervening

decision do not keep it from being a new rule if the precedents do not "compel" the decision. *Id.*

Petitioner argues that if the Michigan appellate courts "had conducted a survey of the legal landscape at the time Mr. Lyons' conviction became final in April 1995, they would have felt compelled by existing precedent to conclude that the rule he seeks was then required by the Constitution." Petitioner relies upon case law from other state court jurisdictions in support of his contention. However, the Michigan courts were not bound by decisions from these other state jurisdictions and therefore surely would not have felt "compelled" to embrace them.[10]

In addition, Petitioner also claims that his legal proposition, that the use of evidence that assumes a statistical probability of guilt violates the presumption of innocence, is not a new rule because it flows directly from bedrock principles stated in long-established federal law cases embracing the presumption of innocence. However, Petitioner's argument is without merit because those cases did not speak to the specific violation of the presumption of innocence alleged here. *See, e.g., Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). In *Cain v. Redman,* 947 F.2d 817, 821–22 (6th Cir.1991), this Court concluded that the rule espoused by *Sandstrom v. Montana,* 442 U.S. 510, 524, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)—that jury instructions containing a presumption indicating that one intends the consequences of his voluntary actions are unconstitutional because they abridge the principles of presumption of innocence

---

**10.** Petitioner criticizes the Michigan Court of Appeals opinion in this case claiming that the case law upon which the court relied in adjudicating this issue was inapposite. *See People v. Lyons,* No. 147006, slip op. at 2 (Mich. Ct.App. April 13, 1994) (J.A. at 133–34). Petitioner argues that: "Inexplicably, the Michigan Court of Appeals failed to recognize any of the problems inherent in the State's probability testimony," and notes that the case relied upon by the court did not involve the probability of paternity statistics nor the pre-

sumption of innocence. However, as noted at the outset of this opinion, Petitioner never raised the presumption of innocence violation at the state court level. His claim before the state appellate courts on this issue was strictly based upon the contention that the evidence was more prejudicial than probative, thereby denying him of his right to a fair trial. As such, the Michigan court's failure to address the claim on the grounds that the evidence infringed on Petitioner's presumption of innocence is quite "explicable."

and allocation of burden of proof thereby denying a defendant due process of law—was a new rule under *Teague* despite these long-established federal cases embracing the presumption of innocence.

As the Court in *Cain* recognized, "a legal ruling sought by a federal habeas petition will be deemed 'new' as long as the correctness of the rule is susceptible to debate among reasonable minds." 947 F.2d at 821 (citing *Butler v. McKellar*, 494 U.S. 407, 415, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990)). Here, it is "susceptible to debate" as to whether the probability of paternity statistics violate the presumption of innocence, inasmuch as courts have allowed the use of these statistics without finding error. *See State v. Hartman*, 145 Wis.2d 1, 426 N.W.2d 320, 329 (1988) (Steinmetz, J., dissenting) (collecting cases from jurisdictions that allow the use of the statistics in question); *see also Coe v. Bell*, 161 F.3d 320, 353 (6th Cir. 1998) (finding that a result is not dictated by precedent "when courts have reached divergent results on an issue before resolution by the Supreme Court"); *Cain*, 947 F.2d at 821 (noting the fact that the jury instructions found to be unconstitutional were routinely given without challenge rendered their correctness "susceptible to debate among reasonable minds"). Therefore, Petitioner's claim that the rule he advocates is not a "new rule" under *Teague* is without merit.

■ Furthermore, Petitioner's alternative claim that the rule falls under *Teague's* second exception to nonretroactivity—those rules which "implicat[e] the fundamental fairness and accuracy of the criminal proceeding"—is also without merit. *Teague*, 489 U.S. at 311, 109 S.Ct. 1060. Petitioner argues that the rule falls under *Teague's* second exception inasmuch as the rule is based upon protecting a defendant's presumption of innocence which lies at the cornerstone of this country's criminal justice system. However, because the new rule lacks the "primacy and centrality of the rule adopted in *Gideon*," it does not

rise to the level of the second exception. *See Saffle*, 494 U.S. at 495, 110 S.Ct. 1257.

As noted, the petitioner in *Cain v. Redman* sought to apply retroactively the new rule espoused by the Supreme Court in *Sandstrom v. Montana*, 442 U.S. 510, 524, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), which was also premised upon a defendant's presumption of innocence; namely, that jury instructions containing a presumption indicating that one intends the consequences of his voluntary actions are unconstitutional because they abridge the principles of the presumption of innocence and the allocation of the burden of proof, thereby depriving a defendant of due process of law. *Cain*, 947 F.2d 817, 819–22 (6th Cir.1991); *see supra* note 4 and accompanying text. The district court found that the petitioner could not invoke the *Sandstrom* rule inasmuch as this new rule did not fall under either of *Teague's* exceptions, specifically *Teague's* second exception, and this Court agreed. *Id.* at 822 (citing *Cain v. Redman*, 757 F.Supp. 831, 835 (W.D.Mich. 1990)). This Court noted that the new rule was "not within the narrow category of fundamental bedrock procedural elements that come within this exception," and adopted the district court reasoning as follows:

> The second *Teague* exception is reserved for "'watershed rules of criminal procedure' that are necessary to the fundamental fairness of the criminal proceeding." *Sawyer v. Smith*, [497 U.S. 227], 110 S.Ct. [2822] at 2831 [111 L.Ed.2d 193 (1990)] (citing *Saffle*, 494 U.S. at 493-94, 110 S.Ct. at 1263). Although the precise contours of this exception may be difficult to discern, the Supreme Court has "usually cited *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), holding that a defendant has the right to be represented by counsel in all criminal trials for serious offenses, to illustrate the type of rule coming with the exception." *Saffle*, 494 U.S. at 495, 110 S.Ct. at 1264. To fit within the second exception, a new

rule must do more than improve the accuracy of the trial; it must alter the understanding of the "bedrock procedural elements essential to the fairness of a proceeding." *Sawyer*, 497 U.S. at 242, 110 S.Ct. at 2831. Against these standards, I conclude that *Sandstrom* does not represent one of the "watershed" rules envisioned by *Teague*.

*Cain*, 947 F.2d at 822 (quoting *Cain v. Redman*, 757 F.Supp. at 835).

Accordingly, inasmuch as a panel of this Court has held that a new rule which found that a jury instruction is unconstitutional because it violated a defendant's due process rights by infringing upon the defendant's presumption of innocence did not fall under *Teague*'s narrow second exception, the similar new rule proposed in this case—that use of evidence which assumes a statistical probability of guilt infringes upon a defendant's presumption of innocence—would likewise not rise to the level of one of the "watershed" rules envisioned by *Teague*. In fact, the *Sandstrom* rule presents an even more compelling case for finding such an exception, inasmuch as the rule deals with a jury instruction that infringed upon the defendant's presumption of innocence, as opposed to the situation in this case where it is alleged that evidence which the jury could weigh and consider as it saw fit infringed upon Petitioner's presumption of innocence.

Furthermore, the new rule proposed by Petitioner is along the lines of that pronounced in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which the Supreme Court later found to be a new rule that did not fit into either of the two exceptions set forth under *Teague*. *See Sawyer v. Smith*, 497 U.S. 227, 242, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990). *Caldwell* held that the Eighth Amendment prohibits the imposition of the death penalty where it was found that the sentencer had been led to believe that the responsibility for determining the appropriateness of the defendant's capital punishment lie elsewhere. 472 U.S. at 328–29,

105 S.Ct. 2633. The petitioner in *Sawyer* argued that the rule espoused in *Caldwell* should fall under the second exception to nonretroactivity. 497 U.S. at 242, 110 S.Ct. 2822. The petitioner contended that the second exception "should be read to include new rules of capital sentencing that 'preserve the accuracy and fairness of capital sentencing judgments.'" *Sawyer*, 497 U.S. at 242, 110 S.Ct. 2822. The Supreme Court, however, disagreed with the petitioner, because his argument disregarded the second requirement of the exception; namely, that the rule must also "'alter our understanding of the bedrock procedural elements' essential to the fairness of a proceeding." *Id.* (quoting *Teague*, 489 U.S. at 311, 109 S.Ct. 1060). Inasmuch as the Court found that *Caldwell* failed to meet this latter requirement, it affirmed the Fifth Circuit's denial of the writ. *Sawyer*, 497 U.S. at 242, 110 S.Ct. 2822.

In addition, the Supreme Court has found it unlikely that a new rule will emerge in modern jurisprudence which alters our understanding of the criminal procedure essential to the accuracy and fairness of a trial. *See Teague*, 489 U.S. at 313, 109 S.Ct. 1060 (finding that it is "unlikely that many such components of basic due process have yet to emerge"). Accordingly, the new rule purported here fails to alter our basic understanding of the "bedrock procedural elements" essential to the fairness of the proceeding, particularly where this Court has found that a similar new rule did not fall under this narrow exception and where it is rare to find such a rule in today's jurisprudence.

The "[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system." *Teague*, 489 U.S. at 309, 109 S.Ct. 1060 (citing Friendly, *Is Innocence Irrelevant? Collateral Attacks on Criminal Judgments*, 38 U.Chi.L.Rev. 142, 150 (1970)). Perhaps Justice Powell best summarized the improvidence of advancing

new rules on collateral review in his concurrence in *Solem*:

> Retroactive application on habeas corpus of constitutional rules governing criminal procedure is unnecessary to advance the purposes of habeas corpus, even under a regime that permits the federal courts on habeas to vacate a final conviction on any properly preserved ground of federal constitutional error. Review on habeas to determine that the conviction rests upon correct application of the law in effect at the time of conviction is all that is required to "forc[e] trial and appellate courts ... to toe the constitutional mark." Nor will fundamental fairness require complete retroactivity, except in rare instances. Because retroactive application of new rules of constitutional law generally does little to advance the purposes of collateral relief on habeas, it is particularly difficult in such cases to justify imposing upon the state the costs of collateral review. These are not insubstantial. They include "the burden on judicial and prosecutorial resources entailed in retrial" and "the miscarriage of justice that occurs when a guilty offender is set free only because effective retrial is impossible years after the offense." Retroactive application of constitutional rules frustrates the state's enforcement of its criminal law despite the state's careful adherence to the federal constitutional standards that governed at the time of the prisoner's conviction.

*Solem*, 465 U.S. at 653–54, 104 S.Ct. 1338 (Powell, J., concurring) (citations and footnotes omitted). For the reasons set forth herein and best summarized by Justice Powell, retroactive application of the new rule proposed by Petitioner is barred by *Teague v. Lane*.

## C.

■ In the dissent, Judge Moore begins her analysis with the presumption that "the state, like any other litigant, loses a defense it fails to raise," and notes that "[t]his presumption is consistent with our general approach to waivers of claims and defenses in civil litigation, and is consistent with our strict enforcement of the procedural requirements imposed on criminal defendants and habeas petitioners."[11] However, in making this presumption, and ultimately finding that the state waived its *Teague* defense, Judge Moore fails to hold Petitioner to this presumptive standard. In other words, Judge Moore focuses on the state's failure to raise the exhaustion and *Teague* defenses; however, in doing so, she palliates Petitioner's failure to exhaust his state court remedies on his evidentiary claim, as well as what would likely be his apparent procedural default. Therefore, it appears that Judge Moore is using the procedural requirements in this case as both a sword and a shield, where she holds the state and Petitioner to a double standard. On the one hand she excuses the Petitioner's failure to exhaust his state court remedies and apparent procedural default; and yet, on the other hand, she refuses to excuse the state's failure to raise the exhaustion and *Teague* defenses. Under the facts of this case, such an outcome is particularly unsettling.

Furthermore, when applying the factors such as federalism, comity, and finality to determine whether to apply *Teague sua sponte* in this case, as suggested by Judge Moore, it is clear that these factors weigh in favor of *Teague*'s application. As noted

---

**11.** Notably, the new statutory requirement in the Antiterrorism Effective Death Penalty Act of 1996 ("AEDPA"), that "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement," casts doubt upon Judge Moore's presumption that a state loses a defense that it fails to raise, at least as it pertains to habeas petition from a state court prisoner. *See* 28 U.S.C.A. § 2254(b)(3) (West Supp.1998). However, the AEDPA does not apply to Petitioner here because he filed his petition for writ of habeas corpus prior to the enactment of the AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

in Section I., there are strong comity concerns in this case, and it would serve in the best interests of finality to apply *Teague* inasmuch as the district court itself—the court which granted Petitioner's application for the writ—found that there is a strong likelihood of reconviction here. This is likewise true for the factor that Judge Moore believes weighs particularly in favor of declining to apply *Teague sua sponte*—the interests of justice. Judge Moore notes in her dissent that the interests of justice include "actual innocence, whether the proper resolution of the merits of the claim is clear, and whether the district court granted habeas relief." However, a thorough application of these factors weighs in favor of applying *Teague* here. First, as noted, there is a strong likelihood that Petitioner would be convicted of this crime again; therefore, his innocence is highly questionable. Second, the resolution of the merits of Petitioner's claim is far from clear as indicated by the case law from the several jurisdictions which allow the use of the statistical data in question. *See State v. Hartman,* 426 N.W.2d at 329 (collecting cases from jurisdictions which allow the use of the statistics in question). Third, although it is true that the district court granted habeas relief, it also refused to release Petitioner from prison pending this appeal. Accordingly, in the interests of justice, *Teague* should be applied *sua sponte* in this case.[12]

## CONCLUSION

In summary, because Petitioner failed to exhaust his state remedies regarding the legal basis upon which the evidentiary claim is made in federal court, this case is not properly before us on habeas review. However, in the interest of judicial economy, we will excuse the lack of exhaustion because Petitioner's evidentiary claim is barred under the doctrine of *Teague v. Lane,* and thus dispositive of this case.

Accordingly, the district court's order granting Petitioner's writ of habeas corpus is **REVERSED.**

GILMAN, Circuit Judge, concurring in part.

I concur in the end result reached by Judge Clay as well as in the analysis set forth in Parts I.A., II.B., and II.C. of his opinion. Because I believe that the state waived its *Teague* defense in this case, however, I disagree with the analysis as set forth in Part II.A. of his opinion.[1] In addition, I decline to join in Judge Clay's analysis as set forth in Part I.B. because I find it unnecessary to address hypothetical circumstances that are not present in the instant case.

## I. Waiver of the *Teague* defense

Relying primarily on *Goeke v. Branch,* 514 U.S. 115, 115 S.Ct. 1275, 131 L.Ed.2d 152 (1995) (per curiam), Judge Clay concludes that the state properly preserved its *Teague* defense. According to Judge Clay, *Goeke* held that "a federal court's application of *Teague* is mandatory, even when raised for the first time at the first hearing on appeal." I believe that Judge Clay has misapprehended the *Goeke* holding. The habeas petitioner in *Goeke* argued in the district court that the state court's dismissal of her appeal, based upon Missouri's fugitive dismissal rule, constituted a violation of due process. This

12. Indeed, it may be argued that in enacting the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress somewhat codified *Teague* to the extent that under the auspices of the AEDPA, federal habeas review is limited to determining whether a state court's decision on the merits of a petitioner's claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C.A.

§ 2254(d)(1) (West Supp.1998). As such, it appears that the trend in the law in reviewing a state prisoner's habeas petition is to apply *Teague. See id.*

1. Because Judge Moore concurs in the analysis set forth in Part I below, this reflects the panel's majority opinion as to the issue there discussed.

argument was construed by the district court as a procedural due process claim. In response, the state argued that the petitioner's claim was barred by *Teague*: "In the District Court, the State argued that respondent's due process claim is barred from litigation in federal habeas corpus unless the Court could say, as a threshold matter, that it would make its new rule of law retroactive. *Teague v. Lane*." *Id.* at 117, 115 S.Ct. 1275 (internal quotation marks omitted). The state again raised the *Teague* defense on appeal, noting that it had also raised this defense at the district court. *See id.* The Eighth Circuit, after relabeling the petitioner's due process argument as substantive rather than procedural, ultimately held that the state had waived the *Teague* defense, and addressed the merits of the case. *See id.*

The Supreme Court reversed the Eighth Circuit's opinion, holding that the state had properly preserved its *Teague* defense. *See id.* at 118, 115 S.Ct. 1275. Contrary to Judge Clay's interpretation, the Court did not hold that the state could assert this defense for the first time on appeal. Rather, the Court clearly indicated that *Teague* was raised at both the district and appellate levels in response to the same issue, regardless of whether it was characterized as procedural or substantive. *See id.* at 117–18, 115 S.Ct. 1275. The Court's statement that "[t]he State's efforts to alert the Eighth Circuit to the Teague problem provided that court with ample opportunity to make a reasoned judgment on the issue," *id.* at 118, 115 S.Ct. 1275, is therefore not inconsistent with the undisputed fact that the state first asserted its *Teague* defense at the district court level.

Judge Clay acknowledges that the *Teague* defense in *Goeke* was first raised in the district court, but argues that the substantiative due process claim presented on appeal was "legally distinct" from the procedural due process claim presented in the district court. I respectfully disagree.

The petitioner in *Goeke* raised the same issue—that the state court's dismissal of her appeal based upon Missouri's fugitive dismissal rule constituted a violation of due process—at both the district and appellate levels. In response, the government raised the *Teague* defense at both stages of the habeas litigation. I thus find no support in *Goeke* for the proposition that the *Teague* defense is properly preserved when raised for the first time on appeal. Nor did the court in *Goeke* face such a situation. In contrast, the state in the present case did not raise the *Teague* defense at all until the case reached the appellate level. *Goeke*, therefore, is not controlling.

In his opinion, Judge Clay cites two cases that he argues are supportive of his interpretation of *Goeke—Ciak v. United States*, 59 F.3d 296 (2d Cir.1995), and *Williams v. Dixon*, 961 F.2d 448 (4th Cir. 1992). In *Ciak*, the Second Circuit stated that the *Teague* defense was waived because the state "did not argue in its brief or at oral argument that *Teague* bar[red] application" of the new rule. 59 F.3d at 302. Similarly, the Fourth Circuit held in *Williams* that the state had waived its *Teague* argument "by its failure to raise the issue at the district court level or at the first hearing before this court." 961 F.2d at 459.

Judge Clay draws an inference from these statements that both the Second and the Fourth Circuits would have held that the state had preserved its *Teague* defense even if raised for the first time on appeal. I, on the other hand, find that the above-quoted statements provide faint support for such an inference. Both cases in fact held that the state had waived its Teague defense when belatedly raised for the first time on appeal, and neither faced the factual situation presently before us. Moreover, the *Williams* court specifically stated that "a state's failure to raise [its *Teague* defense to] the issue of retroactivity below constitutes waiver of that defense." *Id.*

I also note that both *Ciak* and *Williams* are cases from other circuits, and are therefore considered only for their persuasive value. As stated above, I do not find them persuasive for the proposition urged by Judge Clay. More importantly, this court has spoken on the very point at issue in *Sinistaj v. Burt*, 66 F.3d 804 (6th Cir. 1995). In *Sinistaj*, this court held that the state had waived its *Teague* defense by raising it for the first time in a motion to amend the district court's judgment. *See id.* at 805 n. 1. Logic dictates that if the *Teague* defense is waived when raised for the first time in a motion to amend the district court's judgment, it is certainly waived when raised for the first time at the appellate level. *Sinistaj* is therefore the controlling precedent in this circuit and is determinative of the present case.

For all of the reasons stated above, I would find that the state has waived its *Teague* defense.

## II. Sua sponte application of the *Teague* defense

Although the *Teague* defense was not properly preserved by the state, we may exercise our discretion to raise the defense *sua sponte*. *See Caspari v. Bohlen*, 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) ("[A] federal court may, but need not, decline to apply *Teague* if the State does not argue it."). In making the determination of whether to apply the *Teague* principle *sua sponte*, we should primarily focus on the fundamental policies underlying *Teague*. The Supreme Court has held that, with two narrow exceptions, a criminal defendant may not benefit from a new rule of constitutional law after direct review of his or her case. *See Teague*, 489 U.S. 288, 305–10, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). This ruling is based upon the "interests of comity and finality." *Id.* at 308, 109 S.Ct. 1060. The habeas corpus process should "protect the finality of state court judgments and ensure comity between the federal and state court systems." *Jones v. Page*, 76 F.3d 831,

850–51 (7th Cir.1996); *see also Fisher v. Texas*, 169 F.3d 295, 305 (5th Cir.1999) ("In the interests of finality and judicial economy, we choose to exercise our discretion and consider whether [petitioner's] claim is barred."). In light of these fundamental principles, I believe that a federal court should presumptively apply the *Teague* analysis *sua sponte* whenever a defendant tries to raise a new constitutional rule for the first time on collateral review.

This presumption, however, is not irrebuttable, and a federal court must consider whether the concerns of finality, federalism, and comity support *Teague*'s application on a case-by-case basis. For instance, a federal appellate court should be particularly vigilant to any indication that the state intentionally neglected to raise the *Teague* defense at the district court level in the hope of getting a favorable determination on the merits, with the idea that it could then raise the issue for the first time at the appellate level if the ruling on the merits was adverse to its interests. Permitting such a practice would allow the state to "sandbag" the appellate court and benefit from its own strategic pleading. In the present case, however, there is no indication that the state is sandbagging this court.

Although Judge Moore agrees that courts may raise the *Teague* defense *sua sponte*, she argues that courts should not invoke the defense *sua sponte* unless there are particularly strong reasons to overlook the state's neglect. In support of her position, she cites various cases in which this court has declined to raise the defense in the face of the state's waiver. *See Coe v. Bell*, 161 F.3d 320, 337 n. 1, 339 n. 3 (6th Cir.1998), *petition for cert. filed*, No. 98–9606 (May 24, 1999); *Sinistaj v. Burt*, 66 F.3d 804, 805 n. 1 (6th Cir.1995); *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1104 n. 4 (6th Cir.) (en banc), *cert. denied*, 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991). These cases, however, fail to provide any analysis or reasoning for the

court's decision not to raise the *Teague* defense *sua sponte*, and thus provide us with little guidance.

Furthermore, I disagree with the implication in Judge Moore's dissent that courts rarely if ever raise the defense *sua sponte*. The *Teague* rule itself was not briefed by the parties and yet was fashioned by the Supreme Court *sua sponte*. Moreover, the defense has been raised by courts sua sponte in subsequent cases, including *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *Fisher v. Texas*, 169 F.3d 295, 305 (5th Cir.1999), and *Spaziano v. Singletary*, 36 F.3d 1028, 1041–42 (11th Cir. 1994). *See* James S. Liebman, *More than "Slightly Retro:" The Rehnquist Court's Rout of Habeas Corpus Jurisdiction in Teague v. Lane*, 18 N.Y.U. REV. L. & SOC. CHANGE 537, 635 n. 247 (1990–91).

Judge Moore further argues that it is particularly unfair for the court of appeals to apply *Teague* once another federal court has declared that a constitutional violation has occurred. I respectfully disagree for two reasons. First, the entire thrust of *Teague* is to limit the issues that can be raised on habeas review, irrespective of the "fairness" of the outcome. Second, Congress expressed a policy choice in enacting AEDPA, as partially codified in 28 U.S.C. § 2254(d)(1), to have the public interest in finality outweigh a criminal defendant's interest in gaining the benefit of a new constitutional rule. *See* 2 JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 30.2c, at 1240–41 (3d ed. 1998) ("In this way, section 2254(d)(1) ... makes the *state court 'decision,'* and not the petitioner's 'independent' complaint, the focus of the federal court review ... [S]ection 2254(d)(1) unqualifiedly limits federal review to legal rules that actually were *in effect* when the state court decided the case ...") (emphasis in original); *see also*

*Zuern v. Tate*, 938 F.Supp. 468, 475–76 (S.D.Ohio 1996) ("Congress intended by [§ 2254(d)(1)] to shield convictions which complied with federal law when entered from reversal by later habeas courts applying 'new' law.").

To the extent that the Supreme Court considered "fairness" in its *Teague* decision, such concern was encapsulated in the analysis itself that allows a habeas corpus defendant to gain the benefit of a new constitutional rule if the rule either (1) "places a class of private conduct beyond the power of the State to proscribe" or (2) is one of the " 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle*, 494 U.S. at 494–95, 110 S.Ct. 1257 (citing *Teague*, 489 U.S. at 311, 109 S.Ct. 1060).

For these reasons, I believe that the presumption in favor of the *sua sponte* application of *Teague* should apply in the instant case. Once raised, I concur with Judge Clay's conclusion in Part II.B. that retroactive application of the new constitutional rule Lyons proposes is barred by *Teague*.

MOORE, Circuit Judge, dissenting.

I respectfully dissent from the majority's decision to apply *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), despite the state's forfeiture of that defense. Because evidence used at Lyons's trial violated the presumption of innocence and because the prosecutor infringed on Lyons's Fourth Amendment rights, I would affirm the district court's decision to issue a writ of habeas corpus.

I agree with Judge Gilman that *Goeke v. Branch*, 514 U.S. 115, 115 S.Ct. 1275, 131 L.Ed.2d 152 (1995), does not require us to apply *Teague* in this case because the state failed to raise this defense in the district court.[1] Our view that a state forfeits its

---

1. As Judge Gilman points out, *Goeke* has no bearing on the outcome in this case because,

in *Goeke*, the state preserved its *Teague* defense by raising it in the district court. The

*Teague* defense if it does not raise it in the district court is therefore the holding of the court on this point.

I also agree with Judge Gilman that, although we are not required to invoke *Teague* when a state has forfeited it, we may exercise our discretion to invoke the defense sua sponte. *See Caspari v. Bohlen*, 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994); *Schiro v. Farley*, 510 U.S. 222, 227, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994). I disagree, however, that a federal court should presumptively invoke the defense sua sponte. I believe that, when a state has failed to raise its *Teague* defense, a federal court should not invoke the defense sua sponte unless there are particularly strong reasons to overlook the state's forfeiture.

Although the Supreme Court has yet to provide much guidance on when we should exercise our discretion to invoke *Teague* sua sponte, this court has had the opportunity to address the issue, and in each instance where the state has failed to raise *Teague* in the district court, we have declined to invoke the defense on our own. *See Coe v. Bell*, 161 F.3d 320, 337 n. 1, 339 n. 3 (6th Cir.1998), *petition for cert. filed*, No. 98–9606 (May 24, 1999); *Sinistaj v. Burt*, 66 F.3d 804, 805 n. 1 (6th Cir.1995); *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1104 n. 4 (6th Cir.) (en banc), *cert. denied*, 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991). The fact that we have declined to invoke *Teague* when a state forfeits it indicates that we should not exercise our discretion to invoke *Teague* unless there are strong reasons to do so.

As a starting point, I would presume that the state, like any other litigant, loses a defense it fails to raise. This presumption is consistent with our general approach to waivers of claims and defenses in civil litigation, and it is consistent with our strict enforcement of the procedural re-

quirements imposed on criminal defendants and habeas petitioners. *See* 2 James S. Liebman & Randy Hertz, Federal Habeas Corpus Practice and Procedure § 22.1, at 856 (3d ed.1998) (arguing that state attorneys "at the least should be held to procedural standards that are no less exacting than those applied to *pro se* prisoners"). Although holding the state to its *Teague* waiver might be viewed as having the effect of "excusing" the petitioner's earlier procedural errors, this outcome does not constitute a "double standard." When a plaintiff makes a procedural error—say, filing a claim after the limitations period has passed—that is subject to an affirmative defense, the defendant must raise the defense in order to preserve it. Failure to do so will "excuse" the late filing. The result I argue for here is directly analogous and is thus no more bizarre than the normal operation of the rules of civil litigation.

Judge Clay argues in favor of the opposite presumption in part by pointing to provisions of AEDPA. He points out AEDPA's rule that exhaustion issues are preserved unless expressly waived and that the new statute adopted much of *Teague*, concluding that the trend is to apply *Teague* and that states should not generally lose defenses they fail to raise. *See ante* at 344 n. 12. As an initial matter, given that AEDPA is not retroactive, *see Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), I do not think it should be made retroactive simply by labeling its provisions a "trend." Moreover, Congress's adoption of *Teague*'s retroactivity principles does not strike me as affecting the parties' pleading burdens, and its clear alteration of the pleading requirements for the exhaustion defense suggests, if anything, that Congress was content with prior law permitting implied *Teague* waivers. *See* Liebman & Hertz

state in the present case forfeited its *Teague* defense when it failed to raise the defense in the district court. *See Sinistaj v. Burt*, 66 F.3d 804, 805 n. 1 (6th Cir.1995) (explaining

that the state forfeited *Teague* because it did not raise the defense in the district court even though it later raised it in a motion to amend the district court's judgment).

§ 22.1, at 852 ("Given that Congress is presumed to be aware of existing caselaw, the congressional choice to limit this requirement of an express waiver to the nonexhaustion defense signals Congress' desire to maintain the practice of finding waiver by default with respect to *other* state defenses. The circuit courts that have considered the issue thus far generally have concluded that the defenses that AEDPA creates (apart from the exhaustion defense) are waiveable, including by default.") (footnotes omitted).

While I begin with this presumption that defenses not raised are forfeited, I recognize our discretion to raise *Teague* sua sponte and have looked for reasons to do so in this case. Beyond the general considerations underlying *Teague* itself, however, I have not identified any factors particular to this case that make sua sponte application of *Teague* appropriate.

Courts applying *Teague* when the state has not preserved it often refer generally to the interests of federalism, comity, and finality. *See, e.g., Fisher v. Texas,* 169 F.3d 295, 305 (5th Cir.1999) ("In the interests of finality and judicial economy, we choose to exercise our discretion and consider whether Fisher's claim is barred."); *Curtis v. Duval,* 124 F.3d 1, 5 (1st Cir. 1997) (stating that "comity and orderly procedure loom large"); *Jones v. Page,* 76 F.3d 831, 850 (7th Cir.), *cert. denied,* 519 U.S. 951, 117 S.Ct. 363, 136 L.Ed.2d 254 (1996), (approving application of *Teague* "out of respect for 'the important policies underlying the finality of state court criminal judgments, [and] non-retroactivity principles'") (quoting district court). Judge Gilman also refers to these interests in explaining his presumption in favor of applying *Teague.* I find it unsatisfactory to rely entirely on these general policies. In my view, the importance of the policies behind *Teague* is the reason we even consider applying *Teague* once the state has waived it.

Two other courts of appeals have tried to guide the discretionary decision to apply

*Teague* by adapting the *Granberry v. Greer,* 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987), test to this context. *See Winsett v. Washington,* 130 F.3d 269, 274 (7th Cir.1997); *Boardman v. Estelle,* 957 F.2d 1523, 1534–37 (9th Cir.), *cert. denied,* 506 U.S. 904, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992). Unfortunately, some of the *Granberry* factors do not make much sense in the *Teague* context. Factors such as finality and federalism will generally weigh in favor of applying *Teague* but can cut either way with respect to exhaustion. The procedural exhaustion context is special because it governs *when,* not *whether,* the federal court will reach the merits of the petition. The *Granberry* factors are therefore not necessarily the most important considerations for deciding when *Teague* should be invoked sua sponte.

One overriding consideration in *Granberry*—the interests of justice—is more easily transferred to the *Teague* context. The interests of justice may include actual innocence, whether the proper resolution of the merits of the claim is clear, and whether the district court granted habeas relief. *See Granberry,* 481 U.S. at 135–36, 107 S.Ct. 1671; *Boardman,* 957 F.2d at 1537. The last of these is relevant for the reason discussed above, that it appears particularly unfair for the court of appeals to apply *Teague* once another federal court has declared that a constitutional violation occurred. In addition, "comity also calls for representatives of states not to agree to federal courts expending substantial time in addressing the merits of a case, only to argue belatedly that the merits should not have been reached." *Agard v. Portuondo,* 159 F.3d 98, 100 (2d Cir.1998) (decision on rehearing), *cert. granted,* —— U.S. ——, 119 S.Ct. 1248, 143 L.Ed.2d 346 (1999). In this case, these factors weigh against sua sponte application of *Teague.*

Many factors logically may bear on whether we should consider *Teague* in a

particular case after it has been waived.[2] Here, the interests of federalism and comity are not different or more weighty than in the usual *Teague*-waiver case. Both a magistrate judge and a district judge have declared that Lyons's conviction was obtained in violation of the Constitution. Under these circumstances, the appearance of justice is compromised when the court of appeals steps into the role of the state's attorney, raising a defense the state has waived in order to bar relief.

Because the *Teague* issue is dispositive of this case, there is no reason to address any other potential issues. To the extent that any opinions do so they offer only personal observations of the authoring judge.

**2.** In addition to the factors already mentioned, courts have treated the failure to raise a retroactivity defense as excusable neglect when *Teague* itself was new, *see, e.g., Hopkinson v. Shillinger,* 888 F.2d 1286, 1288–91 (10th Cir.1989), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3256, 111 L.Ed.2d 765 (1990), or when the state reasonably believed that the petitioner did not seek the benefit of a new rule, *see Thomas v. Gilmore,* 144 F.3d 513, 516 (7th Cir.1998), *cert. denied,* ── U.S. ──, 119 S.Ct. 907, 142 L.Ed.2d 905 (1999). Courts have also refused to raise *Teague* after granting discretionary review—such as certiorari or rehearing en banc—for the purpose of considering a substantive issue. *See Schiro v. Farley,* 510 U.S. 222, 228–29, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994); *Eaglin v. Welborn,* 57 F.3d 496, 498–99 (7th Cir.) (en banc), *cert. denied,* 516 U.S. 965, 116 S.Ct. 421, 133 L.Ed.2d 338 (1995); *but see Caspari v. Bohlen,* 510 U.S. 383, 388–90, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (holding that the *Teague* question was fairly included in the substantive question on which certiorari was granted).